# Syllabus

Chief Justice:
Robert P. Young, Jr.

Justices:
Stephen J. Markman
Mary Beth Kelly
Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Corbin R. Davis

PEOPLE v ACKLEY

Docket No. 149479. Argued March 10, 2015. Decided June 29, 2015.

Leo D. Ackley was convicted by a jury in the Calhoun Circuit Court of first-degree felony murder, MCL 750.316(1)(b), and first-degree child abuse, MCL 750.136(b)(2), after his live-in girlfriend's three-year-old daughter died while in his care. At trial, the prosecution called five medical experts who testified that the child had died as the result of a head injury that was caused intentionally, while defense counsel called no experts, despite having been provided court funding for expert assistance and the name of a well-known forensic pathologist who could support the defense theory that the injuries had resulted from an accidental fall. Defendant appealed his convictions as of right, arguing that his lawyer's failure to meaningfully challenge the prosecution's expert testimony violated his Sixth Amendment right to the effective assistance of counsel. The Court of Appeals, BOONSTRA, P.J., and SAWYER and SHAPIRO, JJ., remanded the matter for an evidentiary hearing under *People v Ginther*, 390 Mich 436 (1973), after which the trial court, James C. Kingsley, J., granted defendant's motion for a new trial. The prosecution appealed. The Court of Appeals, OWENS, P.J., and MURRAY and RIORDAN, JJ., reversed in an unpublished opinion per curiam issued April 22, 2014 (Docket No. 318303), holding that the trial court had abused its discretion by granting a new trial because defense counsel's decisions regarding experts were trial strategy and no prejudice had resulted. Defendant appealed. The Supreme Court ordered and heard oral argument on whether to grant the application for leave to appeal or take other peremptory action, limited to the issue whether defendant was denied the effective assistance of counsel based on trial counsel's failure to adequately investigate the possibility of obtaining expert testimony in support of the defense. 497 Mich 910 (2014).

In a unanimous opinion by Justice MCCORMACK, the Supreme Court, in lieu of granting leave to appeal, *held*:

Defendant was denied the effective assistance of counsel by his trial counsel's failure to investigate adequately and to attempt to secure suitable expert assistance in the preparation and presentation of his defense. Expert testimony was critical in this case to explain whether the cause of the child's death was intentional or accidental. Defense counsel's failure to attempt to engage a single expert witness to rebut the prosecution's expert testimony, or to attempt to consult an expert with the scientific training to support the defense theory of the case, fell below an objective standard of reasonableness, and there was a reasonable probability that this error affected the outcome of the trial. Accordingly, defendant was entitled to a new trial.

1.  The Court of Appeals erred by concluding that defense counsel's decision to consult only Dr. Brian Hunter in preparation for trial was objectively reasonable.  There was no objectively reasonable explanation in the record for counsel's decision to confine his pursuit of expert assistance to Hunter, a self-proclaimed opponent of the very defense theory counsel was to employ at trial, despite Hunter's having referred counsel to at least one other expert who could provide qualified and suitable assistance.  Counsel's failure to engage expert testimony rebutting the state's expert testimony and failure to become versed in the technical subject matter constituted a constitutional flaw in the representation, not reasonable strategy.  Given the centrality of expert testimony to the prosecution's proofs and the highly contested nature of the underlying medical issue, counsel's single error of failing to consult an expert who could meaningfully assist him constituted ineffective assistance.

2.  But for counsel's deficient performance, there was a reasonable probability that the outcome of defendant's trial would have been different.  Defendant's conviction turned on the jury's assessment of the prosecution's theory that the child's fatal injuries were the result of intentional abuse, which was advanced through the testimony of five experts.  Because defendant's own testimony and that of his lay character witnesses were extremely unlikely to counter this formidable expert testimony, expert assistance in defendant's favor was critical to provide the jury with another viable and impartial perspective on the facts of the case while contradicting the prosecution's theory of how the child died.  The prosecution's voluminous expert testimony made the need for an effective response by defense counsel particularly apparent and strong, and it rendered counsel's failure to offer expert testimony particularly glaring and harmful to the defendant.  This consequence militated in favor of defendant's claim of relief.  Further, the prosecution's nonexpert evidence was highly circumstantial, heavily contested, and far from dispositive of the issue of defendant's guilt.  While a battle of the experts might not have ensured defendant's acquittal, counsel's failure to prepare or show up for the battle sufficiently undermined confidence in the outcome of this case to entitle defendant to relief.

Court of Appeals judgment reversed; conviction vacated; case remanded to the trial court for further proceedings.

©2015 State of Michigan

# OPINION

Chief Justice:          Justices:
Robert P. Young, Jr.    Stephen J. Markman
                        Mary Beth Kelly
                        Brian K. Zahra
                        Bridget M. McCormack
                        David F. Viviano
                        Richard H. Bernstein

FILED  June 29, 2015

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

　　　　Plaintiff-Appellee,

v                                                     No. 149479

LEO DUWAYNE ACKLEY, a/k/a LEO
DUANE ACKLEY, JR., and LEO
DUWAYNE ACKLEY II,

　　　　Defendant-Appellant.

BEFORE THE ENTIRE BENCH

MCCORMACK, J.

The question before us is whether the defendant was denied the effective assistance of counsel by his trial counsel's failure to investigate adequately and to attempt to secure suitable expert assistance in the preparation and presentation of his defense. In this case involving the unexplained and unwitnessed death of a child, expert testimony was critical to explain whether the cause of death was intentional or accidental. Contrary to the determination of the Court of Appeals, we conclude that defense counsel's failure

to attempt to engage a single expert witness to rebut the prosecution's expert testimony, or to attempt to consult an expert with the scientific training to support the defendant's theory of the case, fell below an objective standard of reasonableness, and created a reasonable probability that this error affected the outcome of the defendant's trial. See *Strickland v Washington*, 466 US 668, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984). Accordingly, we reverse the judgment of the Court of Appeals, vacate the defendant's convictions, and remand for proceedings consistent with this opinion.

## I. FACTS AND PROCEDURAL HISTORY

The defendant was convicted by a jury of first-degree felony murder, MCL 750.316(1)(b), and first-degree child abuse, MCL 750.136b(2), after his live-in girlfriend's three-year-old daughter died while in his care. According to the defendant, the child had been napping alone in her room before he discovered her lying unresponsive on the floor next to the bed. The prosecution alleged that the defendant killed the child, either by blunt force trauma or shaking. The defendant denied hurting the child, and said that she must have died as the result of an accidental fall.

Given the lack of eyewitness testimony and any other form of direct evidence, expert testimony was the cornerstone of the prosecution's case. The prosecution called five medical experts to testify at trial about the cause of the child's death: two general pediatricians, a pediatric critical care doctor, a trauma surgeon, and a forensic pathologist.[1] Each testified that the child died as a result of abusive head injury caused

---

[1] The prosecution also called an expert in emergency medicine, who testified regarding the child's initial triage and treatment in the Battle Creek Health Systems Emergency Department.

2

either by nonaccidental shaking, blunt force trauma, or a combination of both. The defense, in contrast, called no expert in support of its theory that the child's injuries resulted from an accidental fall, although the court had provided funding for expert assistance.

The defendant appealed his convictions as of right, arguing that he was entitled to a new trial because his lawyer's failure to meaningfully challenge the prosecution's expert testimony regarding the cause of the child's death violated his Sixth Amendment right to the effective assistance of counsel. The Court of Appeals remanded for an evidentiary hearing pursuant to *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973). *People v Ackley*, unpublished order of the Court of Appeals, entered May 24, 2013 (Docket No 310350).

At the *Ginther* hearing, the defendant's trial counsel testified that he contacted only one expert to prepare for trial: forensic pathologist Brian Hunter. Dr. Hunter testified that, after reviewing some of the case materials, he advised counsel "right off the bat" that he was "not the best person" for the defense. He also explained to counsel that there was a marked difference of opinion within the medical community about diagnosing injuries that result from falling short distances, on the one hand, and shaken baby syndrome (SBS) or, as it is sometimes termed, abusive head trauma (AHT), on the other hand. Hunter asserted that this divide is "like a religion" because each expert has deeply held beliefs about when each diagnosis is supported, and the defendant should have the benefit of an expert who, "[i]n his or her religion, believes this could be a short-fall death." Hunter emphasized to counsel that he was on the wrong side of this debate to be able to assist the defendant.

3

Hunter then referred counsel to at least one well-known forensic pathologist,[2] Dr. Mark Shuman, who had conducted substantial research on short falls. Hunter characterized Dr. Shuman as the "best person" to assess the "complex" short-fall mechanism involved in the defendant's theory. Hunter could not promise that Dr. Shuman would "buy into every story the defendant is selling," but he informed counsel that Dr. Shuman was a "man of science . . . he's the guy that's going to give you your best shot."

Counsel testified that he never contacted Shuman, or any other expert in short falls. Nor did he read any medical treatises or other articles about the medical diagnoses at issue. Though recognizing that expert testimony can carry great weight with a jury, he nevertheless stated that while it may have been "prudent" for him to have consulted "the over 400 treatises available" in preparing his cross-examinations of the prosecution's experts "that wasn't the strategy."[3] Instead, he requested a second consultation with Hunter, offering the simple (albeit inexplicable) justification that Dr. Shuman "was not going to work out." Hunter reiterated his concerns with defense counsel's choice to use him, unambiguously warning counsel again that "you don't want me as your defense expert."

---

[2] There was conflicting testimony between Hunter and defense counsel about Hunter's referral(s). According to counsel, Hunter referred him to two experts: Dr. Shuman and Dr. Werner Spitz. According to Hunter, he referred counsel to Dr. Shuman only. In any event, counsel admitted that he never contacted either expert.

[3] Defense counsel explained that he preferred to attack the experts exclusively through the "gray area" that Hunter supplied—namely, that there had been no studies as to the actual force necessary to achieve fatal blunt-force head injuries in children.

Counsel testified that he nevertheless continued to rely on only Hunter in his trial preparation, consulting him at least two more times before trial. Specifically, counsel provided Hunter with additional—but incomplete[4]—portions of the case materials so that Hunter could give counsel advice on how to approach the prosecution's experts. Counsel admitted that Hunter's advice was his only method of preparing to cross-examine the prosecution's experts on the viability of their SBS/AHT theory of the child's cause of death.[5]

Finally, the parties stipulated to the admission of an affidavit from Dr. Werner Spitz, another well-known expert in forensic pathology. After reviewing the autopsy report, postmortem photographs, and the trial transcripts, Dr. Spitz opined that the bruises on the child's body were consistent with the intubation and CPR she received on the day of her death. He then averred that he would have testified that the child's head injuries could not be attributed to SBS/AHT but were caused by a likely accidental "mild impact."

Based on this evidence, the trial court granted the defendant a new trial. It found that counsel's original failure even to attempt to contact either Dr. Shuman or Dr. Spitz

---

[4] Most notably, counsel failed to provide Hunter with certain critical case materials regarding injuries the child had suffered not long before her death, including: (1) a witness statement that the child had fallen off a trampoline, had struck her head, had briefly gone unconscious, and had been complaining of headaches in the days leading up to her death, and (2) the police report of the accident, which indicated that the child had been lethargic, had been vomiting, and had lost control of her bowels the day before she died.

[5] Counsel explained at the *Ginther* hearing that he was not paid for pretrial preparation.

5

was objectively unreasonable, and that there was a reasonable probability of a different result at trial had counsel engaged his own medical expert.

The Court of Appeals reversed, concluding that while there was no clear error in the trial court's findings of fact, the trial court had abused its discretion in finding a constitutional violation because counsel's "decision not to consult a second expert constituted trial strategy." *People v Ackley*, unpublished opinion per curiam of the Court of Appeals, issued April 22, 2014 (Docket No. 318303), p 4. The court also held that even if counsel should have contacted an expert other than Hunter, no prejudice resulted in light of all the evidence against the defendant.

The defendant sought leave to appeal in this Court. We heard oral argument on the application, limited to the issue of "whether the defendant was denied the effective assistance of counsel based on trial counsel's failure to adequately investigate the possibility of obtaining expert testimony in support of the defense."[6]

## II. STANDARD OF REVIEW

Whether the defendant received the effective assistance of counsel guaranteed him under the United States and Michigan Constitutions is a mixed question of fact and law. *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012), citing *People v Armstrong*, 490 Mich 281, 289; 806 NW2d 676 (2011). This Court reviews for clear error the trial court's findings of fact in this regard, and reviews de novo questions of constitutional law. *Trakhtenberg*, 493 Mich at 47.

---

[6] *People v Ackley*, 497 Mich 910 (2014).

6

## III. ANALYSIS

Both the Michigan and United States Constitutions require that a criminal defendant be afforded the assistance of counsel in his or her defense. US Const, Am VI; Const 1963, art 1, § 20. To be constitutionally effective, counsel's performance must meet an "objective standard of reasonableness." *Trakhtenberg*, 493 Mich at 52. To show that this standard has not been met, a defendant must "overcome the strong presumption that counsel's performance was born from a sound trial strategy." *Id.*, citing *Strickland v Washington*, 466 US at 689. But "a court cannot insulate the review of counsel's performance by calling it trial strategy"; counsel's strategy must be sound, and the decisions as to it objectively reasonable. *Trakhtenberg*, 493 Mich at 52. Courts must determine whether the "strategic choices [were] made after less than complete investigation," or if a "reasonable decision [made] particular investigations unnecessary." *Strickland*, 466 US at 690-691.

To obtain relief for the denial of the effective assistance of counsel, the defendant must show that counsel's performance fell short of this "objective standard of reasonableness" and that, but for counsel's deficient performance, "there is a reasonable probability that the outcome of [the defendant's trial] would have been different." *Trakhtenberg*, 493 Mich at 51. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 US at 694.

### A. COUNSEL'S PERFORMANCE

Turning first to the performance prong of the *Strickland* analysis, we disagree with the Court of Appeals that counsel's decision to consult only Dr. Hunter in preparation for trial was objectively reasonable. Rather, like the trial court, we conclude that counsel

7

performed deficiently by failing to investigate and attempt to secure an expert witness who could both testify in support of the defendant's theory that the child's injuries were caused by an accidental fall and prepare counsel to counter the prosecution's expert medical testimony.

As defense counsel was well aware before trial, the prosecution's theory of the case was that the defendant intentionally caused the child's unwitnessed injuries, a premise that it intended to prove with expert testimony. This testimony would require a response, and indeed, the court granted counsel funding to seek expert assistance of his own. Yet counsel contacted only Hunter, who repeatedly made clear that he credited the prosecution's SBS/AHT theory and disagreed with the defense's theory. While conceding that the SBS/AHT diagnosis was not universally accepted within the medical community, Hunter explained to counsel that he "really d[id]n't think [he] could help" the defendant because he was on the wrong side of this debate in his field.

As a solution, he advised counsel to consult Dr. Shuman, who not only was on the defendant's side of the SBS/AHT debate generally, but was significantly more likely to agree with the defendant's claim that the child's death in this case must have been accidental. Hunter even suggested that Dr. Shuman was more qualified because he had studied short falls extensively. Whereas Hunter was part of the group of experts who "don't have a good model" to support the accidental fall theory, Dr. Shuman was "someone who has dug into the physics" and the "proposed models" of a short-fall injury. Hunter also characterized Dr. Shuman as a "man of science" and as "the best expert in these types of situations." Yet counsel ignored this advice. He did not contact Dr.

8

Shuman or any other forensic pathologist with expertise in short falls, rendering Hunter his expert by default.

Counsel did not have sufficient information to legitimate this "choice." While an attorney's selection of an expert witness may be a "paradigmatic example" of trial strategy, that is so only when it is made "*after* thorough investigation of [the] law and facts" in a case. *Hinton v Alabama*, ___ US ___; 134 S Ct 1081, 1088; 188 L Ed 2d 1 (2014) (emphasis added). In this case, the record betrays no objectively reasonable explanation for counsel's decision to confine his pursuit of expert assistance to Hunter, a self-proclaimed *opponent* of the very defense theory counsel was to employ at trial, despite Hunter's referral to at least one other expert who could provide qualified and suitable assistance to the defendant. Nor is there any indication that counsel had the requisite familiarity with SBS/AHT or short-fall death theories to justify his settling on consulting only Hunter. To the contrary, counsel admittedly failed to consult any of the readily available journal articles on SBS/AHT and short-fall deaths, and did not otherwise educate himself or conduct any independent investigation of the medical issues at the center of the case, beyond his limited consultations with Hunter. See *Trakhtenberg*, 493 Mich at 54 n 9 (noting that "a defense attorney may be deemed ineffective, in part, for failing to consult an expert when counsel had neither the education nor the experience necessary to evaluate the evidence and make for himself a *reasonable, informed determination* as to whether an expert should be consulted or called to the stand . . . .") (quotation marks and citation omitted); *Lindstadt v Keane*, 239 F3d 191, 202 (CA 2, 2001) (noting that counsel's lack of familiarity with pertinent sexual abuse studies and failure to conduct any relevant research "hamstrung" his effort to

9

effectively cross-examine the prosecution's expert witness); *Holsomback v White*, 133 F3d 1382, 1387-1389 (CA 11, 1998) (holding that counsel's failure to conduct an adequate investigation into medical evidence of sexual abuse was ineffective).

We fail to see how counsel's sparse efforts satisfied his "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," *Hinton*, 134 S Ct at 1088, quoting *Strickland*, 466 US at 690-691, especially in light of the prominent controversy within the medical community regarding the reliability of SBS/AHT diagnoses. See *State v Edmunds*, 308 Wis 2d 374, 391-392; 746 NW2d 590 (2008) (holding that the "significant dispute" and "shift in the mainstream medical community" regarding SBS/AHT diagnoses since the defendant's trial established a reasonable probability that a different result would be reached in a new trial, entitling the defendant to relief); Findley et al., *Shaken Baby Syndrome, Abusive Head Trauma, and Actual Innocence: Getting It Right*, 12 Hous J Health L & Policy 209, 212 (2012) (explaining that, in SBS/AHT cases, "it is critical to assess the reliability of the diagnoses under the standards of evidence-based medicine"). In this case involving such "substantial contradiction in a given area of expertise," counsel's failure to engage "expert testimony rebutting the state's expert testimony" and to become "versed in [the] technical subject matter" most critical to the case resulted in two things: a defense theory without objective, expert testimonial support, and a defense counsel insufficiently equipped to challenge the prosecution's experts because he possessed only Dr. Hunter's reluctant and admittedly ill-suited input as his guide. *Knott v Mabry*, 671 F2d 1208, 1212-1213 (CA 8, 1982). This "constitute[d] a constitutional flaw in the representation" of the defendant, not reasonable strategy. *Id*. at 1213.

10

In concluding otherwise, the Court of Appeals stressed that counsel is not required to shop for experts until finding one who will offer favorable testimony. We do not dispute that general proposition, but we fail to see its relevance here. In this case, counsel did no consultation at all beyond settling on the very first expert he encountered, despite the importance of expert medical testimony in the case and despite that expert's specific recommendation to contact a different and more suitable expert.

Nor can we agree with the Court of Appeals that Dr. Hunter's comments regarding Dr. Shuman's impartiality rendered it "reasonable for [counsel] to conclude that consulting a second expert would not be useful." *Ackley*, unpub op at 4. Hunter's warning that Dr. Shuman "would not buy into every story" or blindly accept the defendant's theory is consistent with scientific integrity, is desirable, and is, indeed, advantageous in the context of expert testimony. But more importantly, Hunter's core message on this very point was that counsel *should* engage Dr. Shuman, a qualified expert better suited to support the defendant's theory. And without having done any research on SBS/AHT or short-fall injuries, or having made any contact with Dr. Shuman, counsel " 'was ill equipped to assess his credibility or persuasiveness as a witness', or to evaluate and weigh the risks of putting him on the stand." *Towns v Smith*, 395 F3d 251, 260 (CA 6, 2005) (citation omitted). "To make a reasoned judgment about whether evidence is worth presenting, one must know what it says." *Couch v Booker*, 632 F3d 241, 246 (CA 6, 2011). Finally, as Dr. Spitz's affidavit plainly demonstrates, Dr. Hunter's advice to consult another expert was well founded.

Accordingly, we conclude that counsel's efforts to investigate and attempt to secure suitable expert assistance in preparing and presenting defendant's case fell below

11

an objective standard of reasonableness. While the Court of Appeals may be correct that counsel's deficiencies in this regard did not infect all of his conduct throughout the trial, see *Ackley*, unpub op at 6, the rest of his advocacy could not cure this crucial error. As the Supreme Court has said, "a single, serious error may support a claim of ineffective assistance of counsel." *Kimmelman v Morrison*, 477 US 365, 383; 106 S Ct 2574; 91 L Ed 2d 305 (1986). Given the centrality of expert testimony to the prosecution's proofs and the highly contested nature of the underlying medical issue, counsel committed exactly that kind of error by failing to consult an expert who could meaningfully assist him in advancing his theory of defense and in countering the prosecution's theory of guilt.

## B. PREJUDICE

We further conclude that, but for counsel's deficient performance, "there is a reasonable probability that the outcome of [the defendant's trial] would have been different." *Trakhtenberg*, 493 Mich at 51; *Strickland*, 466 US at 694. As set forth above, the defendant's conviction turned on the jury's assessment of the prosecution's cause-of-death theory, which was advanced through the testimony of five experts, each of whom concluded that the child's injuries were the result of some form of intentional abuse. The defendant's own testimony and that of his lay character witnesses were extremely unlikely to counter this formidable expert testimony. Therefore, the absence of expert assistance in the defendant's favor was critical. It prevented counsel from testing the soundness of the prosecution's experts' conclusions with his own expert testimony and with effective cross-examination. And again, as Dr. Spitz's affidavit shows, such expert

12

assistance *was* available and would have provided the jury with another viable and impartial perspective on the facts of the case while contradicting the prosecution's theory of how the child died.

The Court of Appeals nonetheless found the prejudice from counsel's deficient performance insufficient to warrant relief, given both the strength of the other, nonexpert evidence of the defendant's guilt, and the sheer multitude of expert testimony the prosecution had marshaled in support of its position. We disagree times two.

First, we fail to see particular strength in the prosecution's nonexpert evidence, which was highly circumstantial, heavily contested, and far from dispositive of the issue of defendant's guilt. There was no explanation for the child's injuries beyond the theories presented by the experts, and the prosecution produced no witnesses who testified that the defendant was ever abusive. In fact, some testimony supported the opposite conclusion; according to the child's mother, the defendant's disciplinary tactics were no different from her own, there was no indication that either of her daughters feared the defendant, there were alternative explanations for some of the child's bruises and physical symptoms,[7] and the child willingly spent time with the defendant and called him "daddy."[8] And while the prosecution claimed that the child began to exhibit health

---

[7] The child's mother attributed these bruises to the child's diet and physical activity, and the prosecution's forensic pathologist stated that the child was mildly anemic and that her bruising had no pattern indicating an object or a hand.

[8] The Court of Appeals also cited the "peculiar" nature of the defendant's actions on the day of the incident as an indication of his guilt. Specifically, the panel found significant the defendant's failure to seek help from his neighbors after discovering the child on the floor, his attempt to revive her by pouring cold water over her, his decision to retrieve the family dog before fleeing the family's home, and his decision to first go to his mother's

13

issues around the time that the defendant entered her life, there was witness testimony to contradict this assertion, and the source and timing of these issues did not coincide with the defendant's move into the family's home or with his assumption of childcare duties.[9] In short, our review of this nonexpert evidence makes plain why the prosecution chose to build its case primarily through the testimony of five experts, but it does little to weaken our conclusion that defense counsel's failure to meaningfully engage and respond to this expert testimony created a reasonable probability of a different outcome at trial.

Nor do we agree with the Court of Appeals that the sheer volume of the prosecution's expert testimony rendered any such efforts by defense counsel futile. This reasoning presumptively prioritizes quantity over quality, and takes no account of the comparative persuasiveness of the "child abuse" and "accidental fall" theories at issue in

---

house rather than the hospital. We do not disagree that the defendant's behavior was relevant and, furthermore, that a jury might consider it evidence of guilt. The probability that the jury would do so, however, might be said to make it even more critical that counsel counter the expert-endorsed theory of his client's guilt with an expert-endorsed theory of his client's innocence. Had counsel provided a different lens through which to view his client's behavior, those same "peculiar" actions by the defendant might have instead been perceived as the missteps of a panicked, but nonetheless innocent, caretaker.

[9] For example, the Court of Appeals cited the child's hair loss as one physical manifestation of abuse, but according to her mother, her hair began thinning before the defendant moved in with the family. In any event, doctors diagnosed it as an infection, not a stress-related issue. The child's regression in toilet training was also emphasized as evidence of abuse. Yet a report from the child's pediatrician attributed her developmental progress, including the fact that she had even *begun* her toilet training, to the defendant's care. Unfortunately, defense counsel never called the child's pediatrician to testify, though these facts could have refuted the prosecution's allegations that the defendant had been physically abusing the child over a sustained period. Counsel's only "explanation" for this omission was that this credible counter-evidence was not needed because it did not fit in with his "trial strategy" of attributing the child's blunt force trauma to a fall from the bed.

the case. It also places the defendant in a near-impossible position, whereby the prejudice caused by his counsel's error is effectively used to foreclose his claim of relief based upon that very error. The prosecution's voluminous expert testimony made the need for an effective response by defense counsel particularly apparent and strong, and it rendered counsel's failure to offer expert testimony particularly glaring and harmful to the defendant. Because of counsel's omissions and the resulting absence of suitable expert assistance, the prosecution's expert testimony appeared uncontested and overwhelming. Contrary to the Court of Appeals, we believe this consequence militates in favor of, rather than against, the defendant's claim of relief.

The Court of Appeals' analysis thus vastly underestimated the value of expert assistance to the defense and the impact of its absence, ignoring the fact that in a SBS/AHT case such as this, where there is "no victim who can provide an account, no eyewitness, no corroborative physical evidence and no apparent motive to kill," the expert "*is* the case . . . ." Tuerkheimer, *The Next Innocence Project: Shaken Baby Syndrome and the Criminal Courts*, 87 Wash U L Rev 1, 27 (emphasis added). Here, expert testimony was not only integral to the prosecution's ability to supply a narrative of the defendant's guilt, it was likewise integral to the defendant's ability to counter that narrative and supply his own. Had an impartial, scientifically trained expert corroborated the defendant's theory, the defendant's account of the child's death would not have existed in a vacuum of his own self-interest. While we cannot say that a battle of the experts would have ensured the defendant's acquittal, counsel's failure to prepare or show up for the battle sufficiently "undermine[s our] confidence in the outcome" of this case to entitle the defendant to relief. *Strickland*, 466 US at 694.

15

## IV. CONCLUSION

For the reasons set forth above, we conclude that the defendant is entitled to a new trial because of his counsel's constitutionally ineffective failure to investigate adequately and to attempt to secure appropriate expert assistance in the preparation and presentation of his defense. Accordingly, we reverse the judgment of the Court of Appeals, vacate the defendant's convictions, and remand to the Calhoun County Circuit Court for further proceedings consistent with this opinion.

Bridget M. McCormack
Robert P. Young, Jr.
Stephen J. Markman
Mary Beth Kelly
Brian K. Zahra
David F. Viviano
Richard H. Bernstein

16