# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

BRIAN KEITH ROBERTS,

       Defendant-Appellant.

UNPUBLISHED
June 6, 2017

No. 327296
Kalamazoo Circuit Court
LC No. 2014-000714-FC

Before: STEPHENS, P.J., and SHAPIRO and GADOLA, JJ.

PER CURIAM.

This case arises from the death of defendant's young son on January 2, 2014, after the child suffered a severe head injury on New Year's Eve, December 31, 2013. Defendant was convicted by a jury of first-degree felony murder, MCL 750.316(1)(b), and first-degree child abuse, MCL 750.136b(2), in connection with his son's death.[1] The trial court sentenced him as a third-offense habitual offender, MCL 769.11, to life imprisonment without the possibility of parole for his felony-murder conviction and 30 to 50 years' imprisonment for his first-degree child abuse conviction. On appeal, defendant argues, among other issues, that he was denied the effective assistance of counsel because his trial counsel failed to properly investigate the medical controversy surrounding abusive head trauma in young children and failed to secure expert testimony in support of the defense theory that his son's head injury was the result of a tragic accident rather than intentional abuse. Because we agree that counsel's performance under the circumstances fell below an objective standard of reasonableness and prejudiced defendant, we vacate defendant's convictions and remand for a new trial.

---

[1] Defendant was also convicted of second-degree murder, MCL 750.317, in connection with the death of his son. Below, defendant asked the trial court to vacate his second-degree murder conviction on double jeopardy grounds, but the trial court refused, opting instead not to impose a sentence for this conviction. It is a violation of double jeopardy to convict someone of multiple murder counts arising from the death of a single murder victim. *People v Clark*, 243 Mich App 424, 429; 622 NW2d 344 (2000). Although we otherwise vacate all of defendant's convictions on ineffective assistance grounds, we note that the trial court should have earlier vacated defendant's second-degree murder conviction under the circumstances, rather than simply choosing not to impose a sentence for that conviction.

## I. BACKGROUND OF THE CASE

### A. BASIC FACTS

Defendant's son was two years old when he died. At trial, testimony revealed that defendant began caring for his son in late September 2013, after the child's mother lost custody of him due to drug addiction. In early September 2013, while the child was living with a relative of his mother, the child underwent a CT scan because he had macrocephaly, or an abnormally large head. The CT scan was performed on September 11, 2013; a follow-up MRI was ordered, but the MRI was never performed.

On December 31, 2013, defendant and his girlfriend, Veronica Witherspoon, along with defendant's son and Witherspoon's five children, went to spend the night at a home that Witherspoon had recently rented. Testimony at trial revealed that the older children were playing upstairs while defendant, Witherspoon, and Witherspoon's newborn baby were downstairs. There was also testimony that one of the older children yelled that defendant's son had wet himself. About 10 minutes later, defendant asked Witherspoon where his son's clothes were, and she responded. Defendant then called for his son to come downstairs to be changed.

Witherspoon testified that she was cleaning up in the kitchen and was facing the sink when she heard one or two thumps. Witherspoon said that when she turned around, she saw defendant holding his son up under the child's armpits and asking, "[W]hat's wrong with him?" According to Witherspoon, defendant looked pale and scared and the child's head was clenched back, his eyes looked "dizzy," and he was spitting up. Witherspoon said she told defendant the child was having a seizure and instructed him to lay the child down, which he did. Defendant began to perform CPR and told Witherspoon to call "911."

Emergency medical responders were driving nearby when the call came in and responded to the house within minutes. When they arrived, the child was not breathing and had no pulse. Although paramedics were able to restart the child's heart, he never regained consciousness. Officers who responded to the scene asked defendant what happened and he told them that his son fell down the stairs. The child was taken to the hospital, where a CT scan performed in the emergency room revealed bleeding in the subdural or subarachnoid spaces surrounding his brain. Dr. Robert Beck, the pediatrician who took over the child's care at 8:00 a.m. on January 1, 2014, testified that the child also had "very obvious retinal hemorrhages." Beck related that a CT scan from earlier in the morning showed evidence of "older fluid collections" around the child's brain, which he agreed was consistent with an older head trauma. On January 2, 2014, doctors determined that the child was brain dead and he was removed from life support.

Detective Kristin Cole testified that she interviewed defendant following the incident. She stated that defendant first told her his son fell down a couple stairs. However, she informed defendant that the medical reports showed that the child could not have suffered the head injuries he did from falling down a few stairs. Cole stated that defendant eventually admitted that he caused his son's fall. Defendant told her that his son made it down the steps. Defendant explained that he sat on the second or third step with his son facing him. He then grabbed the child's ankles and pulled them out, "intending for him to land on his butt so that [he] could

change him out." Instead of landing on his butt, however, defendant explained that the child "went straight back and hit his head on the carpet."

## B. TRIAL

The prosecution charged defendant with first-degree felony murder, second-degree murder, and first-degree child abuse arising from his son's death. At trial, the prosecution's theory was that defendant handled the child in a violent and angry manner because the child had wet himself. The prosecution also contended that the child's head injuries could only have been intentionally inflicted or inflicted with wanton and willful disregard of the life-endangering consequences of the act based on its experts' conclusions regarding the amount of force necessary to cause the injuries and the short time in which the child became symptomatic. To this end, the prosecution presented the expert testimony of Dr. Beck, Dr. Brandy Shattuck, a forensic pathologist, and Dr. Rudolph Castellani, a neuropathologist.

Dr. Beck opined that head injuries like those sustained by defendant's son would only be seen "in children who are riding bicycles hit by cars, who are in car seats and T-boned at high speeds, in car seats appropriately restrained but involved in high-speed rollovers, [and] acknowledged shaken episodes." He further testified that "retinal hemorrhages are child abuse unless you can prove through a witnessed account some mechanism of injury that could have caused it." When asked by the prosecutor whether the child's injuries could be consistent with his legs being "taken up" and the child being "thrown down," Beck stated that it "could be a scenario," but explained that it would be "the type of maneuver that I do when I do my ten pound sledge hammer cracking rock . . . for my driveway." On cross-examination, defendant's attorney, Eusebio Solis, asked Beck whether the child's injuries could have been caused if he was in a standing position and his ankles were "grabbed to put him on his butt but he goes all the way back" in a "whiplash motion and he strikes his head." Beck agreed that such a scenario could be a mechanism of injury, but stated that it boiled down to "the speed and the force at which the head hits."

Dr. Shattuck concluded that the child's injuries were "non-accidental" and characterized the force required to cause the injuries as "violent or angry or aggressive types of force" that were "the equivalent of a car accident[.]" When asked by the prosecutor whether the child's injuries could have been caused by "grabbing [his] ankles, pulling him down," Shattuck stated that it depended on "how much force you [use to] pull him," noting that the force would "ha[ve] to be significant." Shattuck further testified that the child's September 2013 CT scan did not reveal "evidence of a bleed," so the older blood around the child's brain must have occurred after the September 2013 CT scan and before the incident in question.

On cross-examination, Shattuck conceded that she did not know exactly how much force would be necessary to cause the child's injuries, but emphasized again that the force would have to be "significant." Solis asked whether the child's injuries could have occurred by defendant pulling on his legs and the child falling back, to which Shattuck stated, "As long as it was a significant force, it wouldn't be a minor pull." When Solis asked why Shattuck characterized the force necessary to inflict the injuries as violent, angry, and aggressive, Shattuck explained that "when people are not in an accident, like a car accident, to get to that level of force, there's usually some type of emotion behind it." Shattuck stated that she listed the manner of death as a

homicide because she believed someone else caused the child's injuries, but she agreed that she could not determine the actor's intent.

Dr. Castellani testified that the child's injuries were indicative of "inflicted trauma." He explained that subdural hemorrhages in a young child are indicative of abuse if "there's not a motor vehicle accident or some major trauma to explain it," and additionally stated that retinal and subarachnoid hemorrhages were also highly suspicious of abuse. He concluded that the child's injuries were inflicted because there was "simply no other explanation that's credible[.]" On cross-examination, Castellani agreed that it would be possible to inflict such injuries by pulling a child's legs out from under him and causing the child to strike his head in a whiplash like motion. He stated, however, that this was "highly unlikely" because, although "the whole force issue is a little bit of guesswork," the "level of force required to cause a complete neurological and cardiovascular shutdown" would be "substantial."

At trial, Solis conceded that the evidence showed that defendant caused his son's fall, but argued that defendant inadvertently caused his son to strike his head and that the child's death was a tragic accident. The defense did not produce its own expert witness, although funds were approved for that purpose. Instead, Solis pointed out the inconsistencies in the prosecution's case and argued that it had not proved beyond a reasonable doubt that defendant possessed the requisite intent. He emphasized that not one medical expert testified that the child's injuries were, to a medical certainty, caused by child abuse because doctors do not determine intent. Intent, he reminded the jury, is the difference between a crime and a tragic accident. The jury rejected defendant's theory and found him guilty as described.

## C. *GINTHER* HEARING

In May 2015, defendant appealed his convictions as of right in this Court. He argued on appeal that Solis did not provide effective representation because he failed to familiarize himself with the medical controversy surrounding diagnoses of abusive head trauma in children and failed to call a medical expert who could have testified favorably for the defense. In February 2016, defendant asked this Court to remand the case to the trial court for an evidentiary hearing—commonly referred to as a *Ginther* hearing after our Supreme Court's decision in *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973)—to develop a factual record concerning his defense counsel's conduct at the trial, and for the opportunity to move for a new trial on the grounds addressed in his appeal. We granted defendant's motion and remanded the case to the trial court so that defendant could move for a new trial, and ordered the trial court to conduct an evidentiary hearing and rule on the motion. *People v Roberts*, unpublished order of the Court of Appeals, entered May 3, 2016 (Docket No. 327296).

At the *Ginther* hearing, Solis testified that he had never handled a case involving abusive head trauma. He admitted that he had told defendant's appellate counsel that he was not familiar with the medical controversy surrounding abusive head trauma in children, but clarified that he "did not see that controversy as a viable defense." Solis explained that in 30 years of practice, he had "never seen a successful short fall defense." Solis testified that it was "correct" that the key issue in the case was the amount of force propelling the child's fall, but he stated that he was unaware of any expert who would testify that the child's injuries could have been caused by a less forceful incident.

-4-

Regarding his trial preparation and investigation, Solis explained that he researched macrocephaly and consulted with a pediatrician who specialized in child abuse, Dr. Stephen Guertin, to determine whether the child's macrocephaly might have made him more susceptible to injury, to get an "assessment of the evidence," and to obtain "a referral of any expert who would say a short fall would cause that injury." Solis stated that Guertin provided him with "articles that talked about children who were injured through falls." With regard to the child's injuries in this case, Guertin told Solis that one could not "rule out accident," but Guertin opined that the child's other injuries were consistent with abuse, which is why, Solis said, he chose not to call Guertin at trial.

Solis also consulted with the prosecution's pathologist, Dr. Shattuck. Based on his discussions with Shattuck, Solis testified that he believed he could get the prosecution's witnesses to concede that "this is not an exact science" and that "we can't determine and we can't rule out, even though they said it was remote, that it could have been caused the way [defendant] said." Solis said he went over the articles he received from Guertin with Shattuck, and she stated that the articles were not comparable because the incidents described were not witnessed and the children did not die. Solis agreed that, at trial, Shattuck testified that the child's injuries were not accidental, although she conceded that pulling the child's legs out from under him could generate sufficient force to cause the injuries.

When asked how he formulated his defense theory, Solis stated that defendant's admissions established that he caused the child's injuries, but there was no evidence that defendant was angry or that he targeted or abused his son leading up to the incident. Solis testified that the circumstances were "indicative of an accidental injury versus an intentional injury," so he cross-examined the prosecution's experts regarding the amount of force necessary to cause the injuries and whether they could have been caused by a whiplash like motion. As for the evidence that the child had an older bleed, Solis said he felt the evidence would show that the child never exhibited a change in behavior and defendant did not have a history of abusing his son, so he could argue that the old injury was accidental.

At the *Ginther* hearing, Dr. Ljubisa Dragovic, a forensic pathologist and medical examiner, testified that he reviewed the report and documentation for the child's autopsy. Dragovic opined that the autopsy should have included more sampling because the preexisting subdural hemorrhage might have played a role in his subsequent head trauma. He testified that there was nothing about the presence of a subdural hemorrhage that suggests an injury was intentionally inflicted; rather, such an injury could occur with "any fall." In Dragovic's opinion, the medical results were consistent with defendant's version of events, and it was "nonsense" to say that the force necessary to cause the child's injuries was comparable to the force involved in a car accident because there was no scientific basis for such a conclusion. He testified that the child's preexisting head trauma may have presented a greater opportunity for reinjury with less force, and there was no basis to determine what caused the prior hemorrhage, except to say that it was caused by the child's head moving and striking an unyielding surface. Dragovic similarly stated that retinal hemorrhages do not, by themselves, indicate child abuse. He further explained that the existence of a prior subdural hemorrhage along with a new one does not indicate abuse. Nor does the immediacy of the child's unresponsiveness indicate abuse. Dragovic concluded that there was no objective evidence in the autopsy report that would allow the conclusion that the child's death was a homicide.

Dr. Julie Mack, a diagnostic radiologist, testified that she reviewed the child's CT scan performed in September 2013 and the two scans performed on January 1, 2014. Mack explained that there is not necessarily a correlation between the extent of a subdural hemorrhage and the degree of impact or force that caused it. Regarding the child's September 2013 CT scan, Mack testified that it showed prominent fluid outside of the child's brain, and the only way to determine whether the excess fluid was normal would have been to have an MRI, which the radiologist recommended, but it was never done. Mack said that the September 2013 CT scan was insufficient to rule out the possibility that the child had small subdural fluid collections outside of his brain, explaining that if there was extra fluid, the bridging veins would be more susceptible to injury with less force. Mack said that the CT scan taken at 12:56 a.m. on January 1, 2014, revealed evidence of a blood clot in the child's sinus that could have been old, in which case it could indicate that the child's brain was compromised before the injury at issue. Mack said that if this was the case, a lesser injury—one that a normal child would have survived "without even turning a hair"—might topple the brain.

Mack testified that the CT scan taken at 5:07 a.m. on January 1, 2014, showed that the child's brain had become so swollen that it almost completely collapsed the ventricles. She explained that if a sinus blood clot had interfered with drainage, every time the heartbeat filled the blood vessels in the child's brain it could cause swelling. Mack stated that, had she been called to testify at trial, she would have said that the child's injuries could have been caused without significant trauma. She conceded that there was a bleed caused by an impact; she merely disagreed that the indications of the old bleed with the new bleed were suggestive of abuse. She further emphasized that there is no way to determine whether an injury was intentionally inflicted from a CT scan.

Following the hearing, the trial court entered an opinion and order rejecting defendant's ineffective assistance claim and denying his motion for a new trial. The case then returned to this Court. On appeal, defendant argues that Solis should have conducted a more thorough investigation of the medical controversy surrounding abusive head trauma in children and should have obtained an expert witness to testify in support of the defense theory.

## II. STANDARD OF REVIEW

Whether a defendant's trial counsel was ineffective involves a mixed question of fact and constitutional law. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). When the trial court has conducted a *Ginther* hearing to determine whether a defendant was denied the effective assistance of counsel, we will review the trial court's factual findings for clear error. *Id.* Appellate courts review de novo the legal question of whether an attorney's acts or omissions fell below an objective standard of reasonableness under prevailing professional norms and prejudiced a defendant's trial. *Id.* This Court reviews for an abuse of discretion a trial court's decision whether to grant a motion for a new trial. *People v Miller*, 482 Mich 540, 544; 759 NW2d 850 (2008). A trial court abuses its discretion when it chooses an outcome falling outside the range of principled outcomes. *Id.*

## III. ANALYSIS

To establish a claim of ineffective assistance of counsel, a defendant must show both that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and that, absent counsel's unprofessional errors, there is a reasonable probability that the result of the proceedings would have been different. *Strickland v Washington*, 466 US 668, 688, 694; 104 St Ct 2052; 80 L Ed 2d 674 (1984). Under the first prong, a defendant must identify those acts or omissions that he contends were not the result of reasonable professional judgment. *Id.* at 690. The reviewing court must then determine whether the identified acts or omissions were outside the wide range of professionally competent assistance under the totality of the circumstances. *Id.* Regarding the second prong, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. This determination must also be made considering the totality of circumstances. *Id.* at 695.

A defense lawyer must be afforded broad discretion in the handling of cases, which includes the discretion to take a calculated risk and select one defense over another as a matter of trial strategy. *People v Pickens*, 446 Mich 298, 325; 521 NW2d 797 (1994). "Yet a court cannot insulate the review of counsel's performance by calling it trial strategy. Initially, a court must determine whether the 'strategic choices [were] made after less than complete investigation,' and any choice is 'reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.' " *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012), quoting *Strickland*, 466 US at 690-691 (brackets in *Trakhtenberg*).

On appeal, defendant maintains that his case is comparable to *People v Ackley*, 497 Mich 381; 870 NW2d 858 (2015). In *Ackley*, a three-year-old child died while in the defendant's care. According to the defendant, the child had been sleeping alone in her room before he found her unresponsive on the floor by her bed. *Id.* at 384. The prosecution's theory of the case was that the defendant killed the child by blunt force or shaking, while the defendant maintained that she died as the result of an accidental fall. *Id.* At a *Ginther* hearing following the defendant's convictions of first-degree felony murder and first-degree child abuse, defense counsel testified that he contacted a forensic pathologist who informed him that "there was a marked difference of opinion within the medical community about diagnosing injuries that result from falling short distances, on the one hand, and shaken baby syndrome (SBS) or, as it is sometimes termed, abusive head trauma (AHT), on the other hand." *Id.* at 385. The pathologist told defense counsel that he was on the wrong side of the debate to assist the defense, and referred defense counsel to another physician. *Id.* Defense counsel never contacted the physician and did not otherwise research the medical diagnoses at issue. *Id.* at 386. The parties also stipulated to the admission of an affidavit from a forensic pathologist who opined that the child's head injuries were likely caused by an accidental, mild impact. *Id.* at 387.

On appeal, the Michigan Supreme Court concluded that defense counsel performed deficiently "by failing to investigate and attempt to secure an expert witness who could both testify in support of the defendant's theory that the child's injuries were caused by an accidental fall and prepare counsel to counter the prosecution's expert medical testimony." *Id.* at 389. The Court explained that counsel's decision to consult only a pathologist who opposed the defense theory was unreasonable in light of the prominent controversy in the medical community over diagnoses of abusive head trauma and because there was no evidence that counsel was familiar

with the controversy. *Id.* at 391-392, 394. The Court concluded that defense counsel's performance prejudiced the defendant because expert testimony "was not only integral to the prosecution's ability to supply a narrative of the defendant's guilt, it was likewise integral to the defendant's ability to counter that narrative and supply his own." *Id.* at 397.

## A. COUNSEL'S PERFORMANCE

In this case, in order to establish the charge of felony murder, the prosecution had to prove that defendant committed second-degree murder and that he did so during the commission of first-degree child abuse. See MCL 750.316(1)(b). A person commits first-degree child abuse if he or she "knowingly or intentionally causes serious physical . . . harm to a child." MCL 750.136b(2). There is no reasonable dispute that defendant performed an act that caused his son to fall and that the child suffered serious physical harm as a result. See MCL 750.136b(1)(f). Accordingly, the primary issue at trial was whether defendant intended to cause the child serious physical harm when he pulled on the child's ankles, or whether he knew that serious physical harm would be the result. See *People v Maynor*, 470 Mich 289, 295; 683 NW2d 565 (2004).

Similarly, in order to establish that defendant committed second-degree murder, the prosecution had to show that defendant acted with the intent to kill the child, intended to cause great bodily harm, or acted in "wanton and willful disregard of the likelihood that the natural tendency of [his] behavior [was] to cause death or great bodily harm." *People v Aaron*, 409 Mich 672, 728; 299 NW2d 304 (1980). As the prosecutor conceded at trial, there was no evidence that defendant intended to kill the child. So the primary issue was whether defendant intended to cause great bodily harm or acted with wanton and willful disregard of the likelihood that the child would suffer death or great bodily harm.

Because there was no direct evidence that defendant possessed the mental state required to prove either second-degree murder or first-degree child abuse, the prosecutor had to rely on circumstantial evidence to establish defendant's state of mind at the time he pulled on the child's ankles. See *People v Unger*, 278 Mich App 210, 223; 749 NW2d 272 (2008). A reasonable defense lawyer confronted with this scenario would know that evidence concerning the force required to cause the child's head injuries would be imperative to proving defendant's guilt. Likewise, a reasonable attorney would understand that the prosecution's case must depend heavily on expert testimony to establish that the child's head injuries could not have occurred unless defendant acted with sufficient force to cause the child to strike his head violently, thereby demonstrating intentionality, knowledge, or wanton and willful disregard of the likelihood that the child would suffer great bodily injury.[2] At the *Ginther* hearing, Solis testified that he knew a

---

[2] Again, to that end, the prosecution presented the expert testimony of Dr. Beck, who opined that the child's head injuries would only have been seen "in children who are riding bicycles hit by cars, who are in car seats and T-boned at high speeds, in car seats appropriately restrained but involved in high-speed rollovers, [and] acknowledged shaken episodes;" the testimony of Dr. Shattuck, who characterized the force required to cause the injuries as "violent or angry or aggressive types of force," equivalent to a "car accident;" and Dr. Castellani, who testified that

key issue at trial would involve the amount of force propelling the child's fall. Yet Solis did not attempt to secure an expert witness who could testify that the child's head injuries resulted from a lesser force than that involved in a car accident, or which could be described as something less than "violent," or who could otherwise prepare Solis to counter the prosecution's expert medical testimony.

Although Solis performed some investigation before trial by researching macrocephaly and consulting with Geurtin and Shattuck, his investigation did not focus on the most important issue of the case—the force with which defendant would have had to act to inflict the child's injuries. The record indicates that Solis failed to investigate this issue and that he was unfamiliar with the medical controversy concerning the amount of force required to inflict the type of injuries involved in this case.[3] See Findley et al., *Shaken Baby Syndrome, Abusive Head Trauma, and Actual Innocence: Getting It Right*, 12 Hous J Health L & Policy 209, 214 (2012) (explaining that "it is no longer generally accepted . . . that massive force—typically described as the equivalent of a multi-story fall or car accident—is required" to produce subdural hemorrhage, retinal hemorrhage, and brain damage, also referred to as the "triad," in young children); see also *Trakhtenberg*, 493 Mich at 54 n 9 ("[A] defense attorney may be deemed ineffective, in part, for failing to consult an expert when counsel had neither the education nor the experience necessary to evaluate the evidence and make for himself a reasonable, informed determination as to whether an expert should be consulted or called to the stand . . . .") (quotation marks and citations omitted).

"While an attorney's selection of an expert witness may be a paradigmatic example of trial strategy, that is so only when it is made after thorough investigation of the law and facts in a case." *Ackley*, 497 Mich at 391 (citations, quotation marks, emphasis, and brackets omitted). In this case, Solis did not demonstrate sufficient understanding of the pertinent medical controversy concerning the amount of force required to inflict the type of injuries involved to legitimize his decision not to attempt to secure expert testimony in support of the defense theory. In cases, like this one, that involve a "substantial contradiction in a given area of expertise," an attorney's failure to engage expert testimony to rebut the prosecution's experts and to become versed in the "technical subject matter most critical to the case" results in "a defense theory without objective, expert testimonial support," and an attorney who is "insufficiently equipped to challenge the prosecution's experts." *Id.* at 392 (quotation marks and citation omitted). Under the circumstances, we conclude that Solis's representation fell below an objective standard of reasonableness.

---

the child's injuries were indicative of "inflicted trauma" because there was "simply no other explanation . . . than an inflicted injury upon the child."

[3] Again, at the *Ginther* heading, Solis admitted that he told defendant's appellate counsel that he was not familiar with the medical controversy surrounding abusive head trauma in children, clarifying that he "did not see that controversy as a viable defense."

## B. PREJUDICE

We further conclude that, absent Solis's deficient performance, there is a reasonable probability that the outcome of defendant's trial would have been different. *Strickland*, 466 US at 694. As discussed above, the prosecution conceded at trial that there was no direct evidence that defendant intended to kill his son when he pulled his ankles and caused him to fall. Accordingly, in order to establish second-degree murder, the prosecution had the daunting task of convincing a jury that defendant grabbed his son's ankles with the intent to cause him to fall and suffer great bodily injury or did so with wanton and willful disregard of the fact that the natural tendency of the act would be to cause death or great bodily harm. *Aaron*, 409 Mich at 728. Likewise, to prove first-degree child abuse, the prosecution had to prove that defendant intended to cause serious physical harm or knew that the result of his actions would be to cause serious physical harm. *Maynor*, 470 Mich at 295.

To that end, the prosecutor repeatedly elicited testimony from her experts suggesting that the child's injuries could not have been caused by anything less than a significant force, akin to a car accident. Although Beck and Shattuck appeared to concede that defendant could have caused his son's injuries by grabbing the child's ankles and causing him to fall and strike his head, their testimony suggested that the child did more than lose his balance. It permitted an inference that the child was thrown backwards by an angry and violent jerking of his feet. Likewise, Castellani's testimony suggested that even that version of events was false. His testimony suggested that defendant must have done something even more forceful and violent— and presumably intentional—to cause his son's injuries.

Although Solis was able to get each of these witnesses to concede to some degree on cross-examination that the child could have suffered the injuries in the manner described by defendant, they all maintained that the injuries could only have occurred if defendant pulled the child down with significant force. The testimony by these experts strongly suggested that the child's injuries on the day at issue were the result of defendant's intentional abuse. Solis testified that he spoke with Guertin after Guertin reviewed the autopsy photographs of the child's brain. According to Solis, Guertin opined that one could not rule out an accident, but he did not provide an opinion about the "cause and origin" of the child's head injuries and did not explain *why* he would not rule out an accident. The lack of clear explanation underlying Guertin's opinion necessitated additional inquiry by Solis. Had Solis been better informed about the abusive head trauma controversy, he might have been able to elicit greater concessions from these experts or might have exposed the weaknesses in their opinions to the jury. Moreover, had he called his own expert or experts to testify that the child could have suffered the catastrophic injuries he did by losing his balance and striking his head, apart from a substantial or violent pull by defendant, the jury might have been persuaded that the prosecution failed to prove that defendant had a culpable state of mind when he grabbed his son's ankles and pulled him down. See, e.g., *Ackley*, 497 Mich at 394-397.

For these reasons, we conclude that defendant received ineffective assistance of counsel because Solis failed to adequately investigate and attempt to secure expert assistance in the preparation and presentation of his defense. Accordingly, we vacate defendant's convictions and remand the case for a new trial. We do not retain jurisdiction.

/s/ Cynthia Diane Stephens
/s/ Douglas B. Shapiro
/s/ Michael F. Gadola