*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* PILAND, Minors.

UNPUBLISHED
September 15, 2022

No. 360062
Ingham Circuit Court
Family Division
LC Nos. 17-000591-NA;
        17-000592-NA;
        18-000996-NA

Before:  M. J. KELLY, P.J., and CAMERON and HOOD, JJ.

PER CURIAM.

Respondent-mother and respondent-father appeal as of right an order terminating their parental rights to three minor children, MP, JP, and VP, under MCL 712A.19b(3)(b)(*ii*) and (j).[1] Because there are no errors warranting reversal, we affirm.

## I.  BASIC FACTS

Respondents' daughter AP was born on February 6, 2017.  Evidence established that she developed severe jaundice, that respondents were informed that she needed immediate medical assistance, and that they refused to obtain such assistance (despite having medical insurance) because they believed in "divine healing" and rejected "manmade" medical care.

AP died on February 9, 2017.  The doctor that performed AP's autopsy opined that AP likely had had "hemolytic disease of the newborn," an incompatibility with her mother's blood that led to an excess of bilirubin.  The doctor testified that hemolytic disease is "extremely

---

[1] The trial court terminated respondents' parental rights during earlier proceedings, but in *In re Piland*, 336 Mich App 713, 717; 972 NW2d 269 (2021), this Court ordered a retrial for the adjudicative phase so that the jury could be instructed in accordance with MCL 722.634.  That statute provides, in relevant part, "[a] parent or guardian legitimately practicing his religious beliefs who thereby does not provide specified medical treatment for a child, for that reason alone shall not be considered a negligent parent or guardian."

treatable" both pre- and post-birth, and explained that the easy availability of treatment had led to a virtual elimination of the disease in the western world. He opined that AP's condition could have been easily treated by giving respondent-mother the medicine "RhoGAM" prenatally. Post-birth, the treatment included "setting a baby in sunlight" or artificial light or, for more advanced cases, giving a blood transfusion. Given the severity of AP's jaundice, the doctor opined that mere sunlight would not have worked in her case.

Respondents, however, refused to treat with RhoGAM prior to AP's birth. Moreover, they also refused to seek medical treatment for AP after she was born. They were informed of the risks by their midwife. She testified that before AP was born she advised respondents that jaundice occurring within 24 hours of birth was likely to be severe. Twenty hours after AP's birth, the midwife conducted a follow-up visit. She observed that AP had "high and marked" jaundice in her face and chest. The midwife again stressed of the risks of jaundice occurring so soon after birth, and she recommended that AP be taken to a doctor or hospital emergency room. Respondent-mother refused, stating that "God makes no mistakes" and "Our baby is fine." The midwife discussed the signs of a worsening problem and, because she was concerned for AP, she scheduled an appointment to come by the next day. Respondent-mother cancelled that appointment, but told the midwife that AP's yellowing was worsening. By 9:00 a.m. on February 8, 2017, AP's grandmother observed that "AP's whole body was nothing but yellow." AP was also lethargic, had spit up something bloody, and had stiffening in her arms and legs. Respondents did not seek medical treatment for AP. She died.

Respondents' daughter VP, born after AP, had the same affliction as AP, and she spent 50 days in a neonatal-intensive-care unit after being taken from respondents' home by Child Protective Services workers. VP made a full recovery.

Throughout the proceedings, respondents maintained that they would not have done anything differently with regard to AP, and they expressed anger that petitioner had obtained medical treatment for VP. They remained adamant that they would not seek medical treatment for any of their children beyond "basic first aid."[2]

The jury found that respondents' home was unfit on the basis of neglect, cruelty, and criminality. Thereafter, the trial court entered an order taking jurisdiction over the children. And, following a termination hearing, the trial court found statutory grounds to terminate respondents' parental rights under MCL 712A.19b(3)(b)(*ii*) and (j). The court also found that termination of respondents' parental rights was in their children's best interests.

---

[2] By way of example, while in foster care, MP was prescribed an EpiPen for a severe allergic reaction, and respondents objected to his having received treatment and stated that they would have not sought it. Further, JP broke his ankle while in foster care, and respondent-mother disagreed with medical professionals that the ankle was broken, averring that if someone obeys God, his or her bones would not break. Respondents expressed to a caseworker that they were "opposed to medical examinations, drug administrations, and manmade medical attention of any kind."

## II. PROSECUTORIAL MISCONDUCT

### A. STANDARD OF REVIEW

Respondents first argue that the prosecuting attorney representing petitioner committed misconduct at the adjudication trial by referring to respondents as "defendants" during closing argument. The test for prosecutorial error is whether the litigant was denied a fair and impartial trial. *People v Watson*, 245 Mich App 572, 586; 629 NW2d 411 (2001). This Court decides issues of prosecutorial error on a case-by-case basis, reviewing the pertinent portion of the record and examining the prosecutor's remarks in context. *People v Noble*, 238 Mich App 647, 660; 608 NW2d 123 (1999). Unpreserved issues are reviewed under the plain-error standard. *In re Utrera*, 281 Mich App 1, 8-9; 761 NW2d 253 (2008). Under the plain-error doctrine, reversal is only warranted if a plain (i.e., a "clear or obvious") error occurred that "affected substantial rights," i.e., "affected the outcome of the lower court proceedings." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

### B. ANALYSIS

During closing argument, the prosecuting attorney representing petitioners, addressed respondents' refusal to allow their midwife to return to their house two days after AP was born. He argued:

> And—and what are the defendants jointly doing when they prohibit [the midwife] from coming? Well, [the midwife] is the person who [sic] they hired. The professional. The trained professional.

Respondents' lawyer objected, stating, "Your Honor, I object to the use of the word defendants. This is—is not a criminal trial." The prosecutor then said:

> Did I say defendants? I—I so much apologize. And I—I want to take—I recluse [sic]—withdraw that from the record—respondents. Thank you. And I apologize. Respondents is the appropriate word. Thank you, [defense counsel].
>
> What did the respondents do—and if I do that again, please scold me. All Right.

Respondents' lawyer replied, "Okay." The trial court did not sustain the objection, nor did it provide the jury with a curative instruction.

Respondents contend that the prosecutor committed misconduct by referring to them as defendants and that the trial court should have responded to the misconduct. However, the prosecutor immediately acknowledged that "defendants" was the wrong term, withdrew his use of the term, and acknowledged that "respondents" was the appropriate term. The trial court had no need to respond to the error given that the prosecutor immediately conceded it and given that respondents' lawyer did not seek any additional instructions based on the prosecutor's conceded error. Furthermore, this single misstatement took place amidst a lengthy closing argument during which the prosecutor repeatedly referred to respondents using the term "respondents." We,

therefore, conclude that respondents were not denied a fair or impartial trial on the basis of the prosecutor's single use of the term "defendants." *Watson*, 245 Mich App at 586.

Additionally, while we are not unaware of the needless impish tone of the prosecutor's response to the objection, we do not believe that it rises to the level of misconduct. The prosecutor's sarcastic comments were in response to the objection raised by respondents' lawyer and they accurately conceded error. Thus, although the prosecutor's response to the objection should have been stated in general terms, particularly in a case of such a serious nature, reversal is not warranted in this case.

## III. INEFFECTIVE ASSISTANCE

Respondents next argue that they were deprived of effective assistance from their attorney during the dispositional hearing because respondents' attorney appeared remotely via videoconferencing technology, while respondents were present in the courtroom. "[T]he principles applicable to claims of ineffective assistance of counsel in the arena of criminal law also apply by analogy in child protective proceedings[.]" *In re Martin*, 316 Mich App 73, 85; 896 NW2d 452 (2016). To obtain relief on the basis of ineffective assistance, a party "must show that counsel's performance fell short of [an] . . . objective standard of reasonableness and that, but for counsel's deficient performance, there is a reasonable probability that the outcome of the . . . trial would have been different." *People v Ackley*, 497 Mich 381, 389; 870 NW2d 858 (2015) (quotation marks, citation, and brackets omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. (quotation marks and citation omitted).

Here, at the beginning of the termination hearing, the prosecutor and the guardian ad litem introduced themselves. Respondents' lawyer then noted that he was "appearing by Zoom." Respondents were present in the courtroom. There were no objections to respondents' lawyer appearing by Zoom. Indeed, the court rules expressly allow for such an appearance during a termination hearing. MCR 3.904 states, in part:

**(B) Child Protective and Juvenile Guardianship Proceedings.**

(1) Except as provided in subrule (B)(2), *courts may allow the use of videoconferencing technology by any participant, as defined in MCR 2.407(A)(1)*, in any proceeding.

(2) As long as the respondent is either present in the courtroom or has waived the right to be present, on motion of either party showing good cause, the court may use videoconferencing technology to take testimony from an expert witness or any person at another location in the following proceedings:

(a) removal hearings under MCR 3.967 and evidentiary hearings; and

(b) termination of parental rights proceedings under MCR 3.977 and trials, with the consent of the parties. A party who does not consent to the use of videoconferencing technology to take testimony from a person at trial shall not be required to articulate any reason for not consenting. [Emphasis added.]

Lawyers are expressly included in the definition of "participants."  See MCR 2.407(A)(1).

Because the court rules explicitly allow for a lawyer representing a respondent-parent to appear by videoconferencing technology, it did fall below an objective standard of reasonableness for respondents' attorney to appear by Zoom.  See *Ackley*, 497 Mich at 389.  Moreover, to the extent that respondents argue that the trial court should not have allowed the dispositional hearing to proceed because respondents' attorney was appearing by Zoom, in light of the court rule allowing for their lawyer to appear using videoconferencing technology, respondents cannot show any error, plain or otherwise.  See *Carines*, 460 Mich at 763.

We also find unpersuasive respondents argument that they were prejudiced because they were prevented from whispering questions and raising concerns to their lawyer.  In *In re Smith-Taylor*, ___ Mich App ___, ___; ___ NW2d ___ (2021) (Docket No. 356585); slip op at 10, rev'd on other grounds 971 NW2d 657 (2022), the respondent had agreed to participate in child-protective proceedings by videoconference but later argued that the trial court erred by failing to inform her of her right to appear in person.  This Court stated, in part, "Respondent failed to set forth any argument as to how the outcome of the proceedings would have been different had they taken place in-person.  Accordingly, respondent has failed to establish that her due process rights were violated."  *Id*. at ___; slip op at 11.  Similarly, respondents in the present case have not indicated how the outcome of the proceedings would have differed if their lawyer had been present in person at the termination hearing.  Indeed, although they mention the inability to whisper to their lawyer, they fail to indicate what, exactly, might have been whispered.  They also do not indicate what physical evidence their lawyer might have presented if he had appeared in person.  As a result, they have not set forth any argument showing that the outcome of the proceedings would have been different if their lawyer had appeared in person.

Affirmed.

/s/ Michael J. Kelly
/s/ Thomas C. Cameron
/s/ Noah P. Hood