*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* THOMPSON, Minors.

UNPUBLISHED
September 22, 2025
2:11 PM

Nos. 373147; 373165
Lapeer Circuit Court
Family Division
LC No. 19-012688-NA

Before: GADOLA, C.J., and MARIANI and TREBILCOCK, JJ.

PER CURIAM.

In these consolidated appeals,[1] respondents appeal by right the trial court's order terminating their parental rights to their minor children, JPT and GLT, pursuant to MCL 712A.19b(3)(c)(*i*) (conditions of adjudication continue to exist), (g) (failure to provide proper care and custody despite financial ability to do so), and (j) (reasonable likelihood of harm if returned to parent). We affirm.

## I. BACKGROUND

Children's Protective Services (CPS) and the Department of Health and Human Services (DHHS) became heavily involved in respondents' lives in December 2017 due to substance-abuse issues. Specifically, after GLT was born with cocaine and opiates in her system, respondent-mother was offered services to address her substance-abuse issues, but the children were allowed to remain in her and respondent-father's care. Nine months later, in September 2018, CPS investigated both respondents for threatened harm and improper supervision related to their substance abuse, and respondents were offered preventative services in an effort to avoid court intervention. In February 2019, however, the trial court took jurisdiction over the children and removed them from respondents' home after respondent-mother overdosed on heroin. Both respondents were offered services, particularly to address their substance-abuse issues. The court

---

[1] *In re Thompson*, unpublished order of the Court of Appeals, entered November 13, 2024 (Docket Nos. 373147; 373165).

-1-

eventually returned the children to respondent-father's care in May 2019, and it subsequently closed the case against respondent-mother in November 2019.

In May 2023, DHHS filed a petition requesting that the trial court again take jurisdiction and remove the children from respondents' home because the home was unfit for the children due to respondents' substance abuse. In the petition, DHHS alleged that a few days prior, then-five-year-old GLT ingested fentanyl in respondents' home while the children were in respondent-mother's care and nearly died as a result. DHHS further alleged that respondents' home was in deplorable condition as a result of their substance abuse; drugs and an extraordinary amount of drug paraphernalia, including empty prescription bottles, used and "loaded" syringes, glass and metal pipes, and bloody washcloths, were found scattered throughout the home. There was also little food in the home and no beds for the children, and the entire home smelled of urine and feces. Following a preliminary hearing, the court authorized the petition, placed the children in the care of their paternal great-grandmother,[2] granted respondents supervised parenting time, and ordered DHHS to engage in reasonable efforts toward reunification.

In October 2023, respondents pleaded no contest to several allegations in the petition and to the court's exercise of jurisdiction. In November 2023, at the initial dispositional hearing, the court ordered respondents to comply with a case service plan provided by DHHS, which required respondents to participate in and benefit from offered services to address their substance-abuse issues, mental-health concerns, and poor parenting skills. Throughout the proceedings, respondents struggled to demonstrate any progress on their case service plan, and in June 2024, DHHS filed a supplemental petition requesting termination of respondents' parental rights. Following a three-day termination hearing,[3] the trial court found that clear and convincing evidence established grounds for termination of respondents' parental rights and that a preponderance of the evidence established that termination was in the children's best interests. The trial court thereafter issued an order terminating respondents' parental rights as previously described. These appeals followed.

## II. REASONABLE EFFORTS

On appeal, respondents argue that DHHS failed to make reasonable efforts toward reunification. Specifically, respondents assert that, because they were both diagnosed with severe opioid use disorder, they suffered from a disability requiring accommodation under the Americans with Disabilities Act (ADA), 42 USC 12101 *et seq.*, and DHHS should have tailored their case service plans accordingly, such as by referring them for psychiatric evaluations and mental-health services to support them through relapse and recovery.

Because respondents did not object below to their case service plan or to the adequacy of the services provided—specifically, DHHS's compliance with the ADA when rendering services—this issue is unpreserved for appellate review. See *In re Atchley*, 341 Mich App 332,

---

[2] The children were formally placed with their paternal great-grandmother, but their paternal grandmother also lived in the home and frequently assisted in caring for the children.

[3] The termination hearing began in September 2024 and concluded in October 2024.

337-338; 990 NW2d 685 (2022). We review unpreserved issues for plain error. *In re Pederson*, 331 Mich App 445, 463; 951 NW2d 704 (2020). To obtain appellate relief under the plain-error standard of review, a respondent first must show: (1) an error occurred, (2) the error was clear or obvious, and (3) the error affected substantial rights. *In re MJC*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 365616); slip op at 2. "Generally, an error affects substantial rights if it caused prejudice, i.e., it affected the outcome of the proceedings." *Id*. at ___; slip op at 2 (quotation marks and citation omitted). After the respondent has satisfied these requirements, "an appellate court must exercise its discretion in deciding whether to reverse. Reversal is warranted when the plain, forfeited error seriously affected the fairness, integrity or public reputation of judicial proceedings." *Pederson*, 331 Mich App at 463 (quotation marks, citations, and ellipses omitted).

In general, when a child is removed from a parent's custody, DHHS must make reasonable efforts toward reunification, except under certain, limited circumstances. *In re Walters*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 369318); slip op at 3-4; see also MCL 712A.19a(2). Reasonable efforts include "creat[ing] a service plan outlining the steps that both [DHHS] and the parent will take to rectify the issues that led to court involvement and to achieve reunification." *In re Matamoros*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 371544); slip op at 4 (quotation marks and citation omitted). DHHS and the trial court must then continually review, update, and revise a parent's case service plan as needed throughout the proceedings to ensure that a parent has "a meaningful opportunity to comply with a case service plan[.]" *In re Mason*, 486 Mich 142, 156, 169; 782 NW2d 747 (2010). Although the ADA does not provide a defense to proceedings to terminate parental rights, *In re Terry*, 240 Mich App 14, 24-25; 610 NW2d 563 (2000), it does require DHHS to reasonably accommodate a disabled parent when providing services to achieve reunification and avoid termination of parental rights, *In re Hicks/Brown*, 500 Mich 79, 86; 893 NW2d 637 (2017), citing 42 USC 12132 and 28 CFR 35.130(b)(7). "[E]fforts at reunification cannot be reasonable under the Probate Code if [DHHS] has failed to modify its standard procedures in ways that are reasonably necessary to accommodate a disability under the ADA." *Hicks/Brown*, 500 Mich at 86.

To start, the ADA protections respondents seek are not applicable in this case. Individuals participating in a supervised rehabilitation or drug-treatment program are generally protected by the ADA. 42 USC 12210(b). That protection, however, does not extend to individuals who are "currently engaging in the illegal use of drugs[.]" 42 USC 12210(a). In this case, respondents, as discussed more thoroughly *infra*, admitted to using and had tested positive for illegal substances, including fentanyl and cocaine, and they admitted to relapsing at least once during these proceedings. Thus, although respondents were diagnosed with severe opioid use disorder and attended a drug-treatment program twice during the proceedings, the record showed that they continued to use illegal drugs throughout the proceedings, and so their disorder would not be considered a disability under the ADA. See 42 USC 12210(a) and (b). Accordingly, respondents' general claim that they were entitled to accommodations under the ADA is without merit.

Regardless, "when challenging the services being offered," the burden is on the parent to identify other "services that would have been appropriate in light of such disability or how the services offered were deficient" and to demonstrate that he or "she would have fared better if other services had been offered." *In re Sanborn*, 337 Mich App 252, 266-267; 976 NW2d 44 (2021). Respondents have not done so in this case. Other than suggesting that referrals to a psychiatrist

-3-

and other forms of mental-health treatment were warranted, respondents do not explain how the services DHHS actually offered to them—which included psychological evaluations, substance-abuse assessments, mental-health counseling, random drug screenings, and substance-abuse counseling—were deficient or how they would have fared better had DHHS offered the other services or accommodations suggested in their briefs on appeal. See *id*. Nor does the record before us indicate as much. Rather, the record reflects that DHHS provided a multitude of services to address respondents' substance abuse but that respondents simply failed to uphold their "commensurate responsibility" to cooperate with, engage in, and benefit from the services offered by DHHS. *Atchley*, 341 Mich App at 339 (quotation marks and citation omitted). Accordingly, the trial court did not reversibly err when it determined that DHHS made reasonable efforts toward reunification. See *Sanborn*, 337 Mich App at 266-267; *Pederson*, 331 Mich App at 463.

## III. STATUTORY GROUNDS FOR TERMINATION

Respondents also argue on appeal that the trial court clearly erred by finding that clear and convincing evidence supported termination of their parental rights under MCL 712A.19b(3)(c)(*i*), (g), and (j). We review for clear error a trial court's finding that a statutory ground for termination of parental rights has been proven by clear and convincing evidence. *In re Simpson*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 368248); slip op at 3. "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *Matamoros*, ___ Mich App at ___; slip op at 4 (quotation marks and citation omitted).

A court may terminate parental rights under MCL 712A.19b(3)(c)(*i*) if it finds by clear and convincing evidence that "after 182 days have elapsed, the conditions resulting in adjudication remain present and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age." *MJC*, ___ Mich App at ___; slip op at 4 (quotation marks and citation omitted). What constitutes a "reasonable time" requires consideration of how long the parent will take to improve the conditions and how long the child can wait for the improvements to occur. See *In re Dahms*, 187 Mich App 644, 648; 468 NW2d 315 (1991). "Even if conditions improved in the months before the termination hearing, a trial court may look to the totality of the evidence to determine whether a parent accomplished meaningful change in the conditions that led to adjudication." *In re Jackisch/Stamm-Jackisch*, 340 Mich App 326, 334; 985 NW2d 912 (2022).

In this case, there is no question that more than 182 days elapsed between the issuance of the initial dispositional order in November 2023 and the issuance of the termination order in October 2024. The conditions that led to adjudication were primarily respondents' substance-abuse issues and the inadequate parenting skills and unsafe home environment that resulted. Based on the totality of the evidence before the trial court at the time of termination, we see no reversible error in the court's conclusion that these conditions continued to be a barrier to reunification and that there was no reasonable likelihood that respondents would rectify them within a reasonable time considering the children's ages.

As noted previously, DHHS had become involved with this family in 2017 and again in 2019 due to substance-abuse issues, and despite the fact that DHHS had provided services to respondents to address these issues (and had ultimately returned the children to respondents' care)

during those proceedings, DHHS once again became involved with this family in May 2023 due to substance-abuse-related issues. Specifically, DHHS intervened after it discovered that the children were living in an unsafe home environment because they were exposed to substances and drug paraphernalia respondents kept throughout the home, and GLT nearly died after ingesting fentanyl she found within her reach while in respondent-mother's care. And by the time of the termination hearing in the instant case, the evidence clearly demonstrated that these issues remained a barrier to reunification.

Respondents' caseworker testified that respondents were largely uncooperative and did not participate in recommended services until after DHHS indicated in May 2024 that it intended to file a supplemental petition to terminate respondents' parental rights. Specifically, respondents were referred for psychological evaluations and substance-abuse assessments at initial disposition in November 2023, but respondents repeatedly missed appointments and required new referrals, and they ultimately did not complete those evaluations and assessments until March 2024. Respondents also repeatedly refused to participate in random drug screens throughout the case, objecting to the first two testing facilities that their caseworker had referred them to. Although the third facility seemed to be satisfactory, respondents did not execute the releases necessary for DHHS to verify their participation and benefit until May 2024, and by the time they did so, DHHS learned that respondents had stopped testing at that facility several months earlier. And although respondents consistently represented that they were receiving substance-abuse treatment and drug testing at Sacred Heart and then BioMed—both methadone clinics—DHHS did not refer respondents to either of these facilities, and in fact, disfavored BioMed due to its past difficulties working with that facility. In any event, during nearly the entire case, respondents refused to execute releases so that DHHS could verify respondents' participation at these facilities, and when respondents finally executed the releases in May 2024, BioMed refused to cooperate with DHHS and ignored a subpoena.

Additionally, testimony and documentary evidence established that, in the few drug screens respondents completed, they tested positive for substances. In February 2024, the court ordered respondents to complete a drug screen immediately after a hearing, and respondents tested positive for fentanyl, cocaine, and xylazine. Immediately thereafter, respondents admitted that they had relapsed and then entered a 14-day inpatient substance abuse program. Despite this, in May 2024, respondents tested positive for cocaine, and respondent-father tested positive for trace amounts of fentanyl. Then, on June 20, 2024, respondent-father tested positive for cocaine, and on July 3, 6, and 7, 2024, respondent-mother tested positive for fentanyl. Respondents disputed—and still dispute on appeal—the accuracy of these June and July drug screens. The owner of the testing facility, however, testified at length at the termination hearing about the facility's testing procedures and the reliability of the tests, explaining that pursuant to protocol, the facility completed "confirmation test[s]" on respondents' positive samples to eliminate the possibility of a false positive, and the owner further testified that she was confident that respondents' positive screens were not false positives based on this additional testing. And even if respondents' screens in June and July were ignored, respondents did not dispute the reliability of the positive screens from a few weeks earlier in May 2024.

Furthermore, on August 20, 2024, two weeks before the start of the termination hearing, respondents entered a 14-day inpatient substance-abuse rehabilitation program for a second time. Respondents testified that neither had relapsed and that they were simply entering the program as

a preventative measure, but respondents also missed all three drug screens scheduled during the week prior to their inpatient admission. Respondents also failed to complete a drug screen on September 4, 2024, which was shortly after their release from the inpatient program and less than two weeks before the start of the termination hearing. Based on this and on the ample other evidence regarding respondents' substance abuse and resistance to drug screenings and other substance-abuse services throughout the proceedings, the trial court did not find credible respondents' testimony that they entered the inpatient program as a preventative measure rather than due to relapse, and we see no basis to disrupt that credibility assessment here. See *Matamoros*, ___ Mich App at ___; slip op at 4.

The record evidence also supported the trial court's findings that there was no reasonable likelihood that respondents would rectify the conditions at issue within a reasonable time considering the children's ages. See MCL 712A.19b(3)(c)(*i*). Including the instant proceedings, DHHS became involved with this family three separate times due to respondents' substance-abuse-related issues, starting back in 2017. The caseworker testified that respondents were largely noncompliant with substance-abuse services throughout much of the instant proceedings until approximately May 2024 when the permanency planning goal was changed from reunification to adoption. And although respondents' participation slightly increased around this time, DHHS was unable to verify their participation in and benefit from any services until then, and even still, they continued to miss drug screens and test positive for substances until the start of the termination hearing. Indeed, both respondents had tested positive for substances only a few months before the termination hearing began, which was almost a year after the issuance of the initial dispositional order and approximately 16 months after the children were removed from respondents' care. Given respondents' lack of participation in the recommended substance-abuse services and continued substance abuse throughout the case, respondents' caseworker did not believe that respondents would consistently participate in or benefit from offered services and rectify their substance-abuse issues if given additional time.

Respondents stress that they participated more toward the end of the proceedings and were making progress by the time the termination hearing started, with respondent-father emphasizing that respondents were "mostly clean" and respondent-mother emphasizing that she "mostly maintained her sobriety." As noted, however, "[e]ven if conditions improved in the months before the termination hearing, a trial court may look to the totality of the evidence to determine whether a parent accomplished meaningful change in the conditions that led to adjudication." *Jackisch/Stamm-Jackisch*, 340 Mich App at 334. Here, the totality of the record before the trial court at the time of termination provided ample basis for the court to conclude that, despite any recent improvements respondents may have made in certain respects, clear and convincing evidence demonstrated they had not "accomplished meaningful change in the conditions that led to adjudication," and there was no reasonable likelihood that they would rectify those conditions within a reasonable time given the children's young ages. *Id.*; MCL 712A.19b(3)(c)(*i*). Based on the record before it, the trial court concluded that respondents' substance-abuse issues had created an unfit and unsafe home environment for the children and that it had no confidence respondents would rectify those conditions within a reasonable time such that the children would be safe if

-6-

returned to their care. Respondents have failed to show that the trial court reversibly erred in reaching this conclusion.[4]

## IV. BEST INTERESTS

Respondents also challenge the trial court's determination that termination was in the children's best interests. We review for clear error a lower court's decision that termination is in a child's best interests. *In re Olive/Metts Minors*, 297 Mich App 35, 40-41; 823 NW2d 144 (2012). "[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013).

When determining whether termination is in a child's best interests, the court should place its "focus on the child rather than the parent." *In re Schadler*, 315 Mich App 406, 411; 890 NW2d 676 (2016). "The trial court should weigh all the evidence available to determine the child's best interests," and it should consider a variety of factors, including "the child's bond to the parent; the parent's parenting ability; the child's need for permanency, stability, and finality; and the advantages of a foster home over the parent's home." *Simpson*, ___ Mich App at ___; slip op at 5 (quotation marks, citations, and alterations omitted). "Other factors that the court may consider include the parent's history, the parent's psychological evaluation, the age of the child, and a parent's substance-abuse history." *MJC*, ___ Mich App at ___; slip op at 10 (citations omitted). The court may also consider, among other things, "the child's well-being while in care," *id.* at ___; slip op at 10 (quotation marks, citation, and alteration omitted), as well as "how long the child was in foster care or placed with relatives, along with the likelihood that the child could be returned to the parents' home within the foreseeable future, if at all," *In re CJM*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 367565); slip op at 4 (quotation marks and citation omitted). The court must also expressly consider a child's placement with a relative, which ordinarily weighs against termination. *Id.* at ___; slip op at 4. When more than one child is involved in the proceedings, the court must consider each child's best interests individually, but it need not make "redundant factual findings" as to matters for which the children's best interests are the same. *In re White*, 303 Mich App 701, 715-716; 846 NW2d 61 (2014).

In challenging the trial court's best-interests determination, respondents stress that there was "uncontroverted evidence" of a strong parent-child bond and that "the children were happy to see their parents." The fact that there was a strong bond between respondents and the children is seemingly undisputed in the record. Both respondents testified that such a bond existed, as did multiple individuals who supervised respondents' parenting times with the children throughout the proceedings. That said, the parent-child bond is one of many factors that must be considered when determining whether termination is in a child's best interests. *Simpson*, ___ Mich App at ___; slip op at 5. And it is clear from the record that the trial court determined that serious concerns for the children's safety and well-being if returned to respondents' care—particularly in light of respondents' history of deficient care due to their substance-abuse issues, their continued substance

---

[4] Given our conclusions regarding these statutory grounds for termination, we need not address respondents' arguments regarding MCL 712A.19b(3)(g) and (j). See *Jackisch/Stamm-Jackisch*, 340 Mich App at 333-334.

abuse throughout the proceedings, and their failure to participate and benefit from substance-abuse services as provided by their case service plan—vastly outweighed any factor weighing against termination. When making its best-interests findings, the court emphasized that, despite years of DHHS involvement and offered substance-abuse services, respondents continued to abuse substances. The court further found that, as a result of respondents' substance abuse, the children lived in deplorable conditions and GLT nearly died after ingesting fentanyl left within her reach while in respondents' care, and given respondents' failure to address their substance-abuse issues, such conditions were still a significant risk to the children's safety and well-being. As discussed above, there was ample record evidence to support these findings, and respondents have not demonstrated a clear error in them. See *Olive/Metts Minors*, 297 Mich App at 40-41.

The trial court also considered the children's needs for permanence, stability, and finality and found that these factors weighed in favor of terminating respondents' parental rights. The trial court's findings were supported by a preponderance of the evidence. At the time of termination, JPT was 10 years old and GLT was six years old. They had been living with relatives for 17 months while they waited for their parents to demonstrate that they could lead a substance-free lifestyle. CPS had been involved with this family for several years. And as noted, this was the second time in the children's short lives that they had been removed from their parents' care. The record amply supported the court's finding that termination of respondents' parental rights would give the children the permanence and finality they needed.

Respondents also assert that the trial court did not give appropriate weight to the fact that the children were placed with a relative or that a guardianship with that relative was a viable (and less harmful) alternative to termination. As noted, before terminating parental rights, a trial court must expressly consider a child's placement with a relative, which ordinarily weighs against termination. *CJM*, ___ Mich App at ___; slip op at 4. Additionally, if the court determines that termination is not in a child's best interests, "a trial court may forego termination and instead place a child in a guardianship." *In re Lombard*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 367714); slip op at 6, citing MCL 712A.19a(8) and (9). As with a best-interests determination for termination of parental rights, however, the trial court "must make an individualized determination" when assessing whether a guardianship in lieu of termination is in a child's best interests. See *Lombard*, ___ Mich App at ___; slip op at 6.

The record in this case clearly demonstrates that the trial court thoroughly considered the children's relative placement and whether a juvenile guardianship or termination was in the children's best interests. Indeed, the court adjourned the termination hearing before making its best-interests determination so that DHHS could further investigate the appropriateness of the relative placement with the children's great-grandmother as a guardianship. The court made clear that it was doing so because there was evidence that the children had thrived in the relative's care and in their school and community—but there was also evidence suggesting that the children's grandmother, who lived with the relative placement and predominantly handled transportation and childcare, did not take respondents' substance abuse seriously and would place the children's safety and well-being at risk by allowing them to return to respondents' care. When the termination hearing resumed, the court received additional testimony from two witnesses regarding the appropriateness of establishing a guardianship with the children's relative placement

and whether that or termination was in the children's best interests.[5] In making its best-interests determination, the court expressly acknowledged the children's relative placement, but given respondents' persistent failure to rectify their substance-abuse issues and the lack of safety, stability, and permanency their children faced as a result, the court ultimately concluded that a guardianship with that relative placement—and the sort of exposure to respondents that the record showed would come with it—would not be appropriate and that termination would be in the children's best interests. See *id.*; *CJM*, ___ Mich App at ___; slip op at 4. The record supports that finding, and respondents again have not identified a clear error in it. See *Olive/Metts Minors*, 297 Mich App at 40-41.

In sum, the record reflects that the trial court properly weighed all the evidence available to it at the time that it made its best-interests determination, *Simpson*, ___ Mich App at ___; slip op at 5, and we see no clear error in its findings, *id.* at ___; slip op at 3.

## V. EFFECTIVE ASSISTANCE OF COUNSEL

Respondents also argue that they were denied the effective assistance of counsel because their respective attorneys failed to call several witnesses and to introduce certain documents purportedly establishing their sobriety and compliance with services. Whether counsel was ineffective presents a mixed question of fact and law, with factual findings reviewed for clear error and questions of law reviewed de novo. *In re Casto*, 344 Mich App 590, 610; 2 NW3d 102 (2022).

The same principles applicable to claims of ineffective assistance of counsel in criminal proceedings are also applicable to child-protective proceedings. *Id.* at 611. Accordingly, to establish ineffective assistance of counsel, a respondent "must show (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and (2) that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different." *People v Shaw*, 315 Mich App 668, 672; 892 NW2d 15 (2016). Counsel is presumed to be effective, and a respondent carries a heavy burden to overcome that presumption. *Casto*, 344 Mich App at 612. This burden includes "overcom[ing] the strong presumption that counsel's performance was born from a sound . . . strategy." *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012). That said, "a court cannot insulate the review of counsel's performance by calling it . . . strategy; counsel's strategy must be sound, and the decisions as to it objectively reasonable." *People v Ackley*, 497 Mich 381, 388-389; 870 NW2d 858 (2015) (quotation marks and citation omitted).

---

[5] The trial court also received and considered ample testimony regarding a possible alternative relative placement with the children's maternal aunt in the neighboring area, who had expressed interest in adopting the children. The court ultimately noted, however, that the immediate task before it was determining whether it was in the children's best interests to "continue the child[ren] in [the current] relative placement" as a juvenile guardianship "or terminate" respondents' parental rights, and it would be up to DHHS to determine where to place the children following termination.

Respondents both argue that their respective attorneys were ineffective for failing to call several witnesses at the termination hearing, such as their therapists, their previous caseworker, and a toxicologist from a testing facility.[6] Respondents both also argue that their respective attorneys failed to introduce a wide array of documentary evidence, including drug screens, certificates of completion, prescriptions, mental health records, housing documents, and employment records. Respondents attach numerous documents to their brief on appeal as appellate offers of proof, including the documents their attorneys purportedly failed to present at the termination hearing, in an effort to show that their attorneys were ineffective. But even if these attached documents are accepted as appropriate offers of proof, respondents have not "overcome the strong presumption" that their attorneys' decisions not to call certain witnesses and not to introduce certain pieces of documentary evidence were "born from a sound . . . strategy" or that those strategic decisions were objectively reasonable. *Trakhtenberg*, 493 Mich at 52; see also *Ackley*, 497 Mich at 388-389.

It is clear from the existing record that all of the witness testimony and documentary evidence that respondents mention on appeal would have been cumulative of what had already been presented at the termination hearing. For instance, based on reports from respondents' therapists that respondents provided on appeal, it is clear that the therapists would have testified that respondents had been participating in therapy since May or June 2024 and were showing some benefit from it. But respondents both testified that they began outpatient therapy with these therapists in approximately May or June 2024 and that they were benefitting from that service, and respondents' caseworker acknowledged that respondents began attending counseling sessions around that time. The trial court was thus well aware that respondents had been participating in counseling since that time. Additionally, the therapists' gauge of whether respondents were benefitting from the service was, in large part, based on respondents' self-reported periods of abstinence from substance abuse, which could be seen as a rather weak and easily discredited basis for such a determination, particularly in light of respondents' positive drug screens. Indeed, based on the record before us, it seems the therapists were unaware that respondents had tested positive for substances in June and July 2024. Moreover, providing testimony from these witnesses and related documentary evidence could have only drawn more attention to the fact that respondents largely failed to participate in offered services until May or June 2024, which was approximately

---

[6] Respondents also briefly argue that their attorneys were ineffective for failing to call "character witnesses . . . at the best interest phase to prove that is [sic] not in the best interest of the children to terminate parental rights." But respondents do not identify any specific individuals who could have been called as character witnesses or detail their purported testimony, nor do they identify how their attorneys' failure to call these unknown witnesses prejudiced them beyond conclusorily stating that "[h]ad these witnesses by [sic] called, the outcome would have been different." Thus, respondents have failed to establish the factual predicate for this claim, *People v Putman*, 309 Mich App 240, 248; 870 NW2d 593 (2015), and therefore have not carried their "heavy burden" of demonstrating that their attorneys performed deficiently in this regard or that, had their attorneys called additional character witnesses, there is a reasonable probability that the outcome of the proceeding would have been different, *Casto*, 344 Mich App at 611-612.

a year after removal and approximately six to seven months after respondents were provided a case service plan at initial disposition.

Respondents are in the same position with respect to their previous caseworker and the toxicologist as witnesses, and any related documentary evidence. As to the previous caseworker, respondents argue that the caseworker would have testified that, at a March 2024 family team meeting, she was prepared to recommend overnight parenting time and that the permanency planning goal remain reunification. A DHHS report documenting the same, however, was provided to the trial court during the proceedings. Additionally, respondents' subsequent caseworker testified at the termination hearing that reunification was still the permanency goal when she was assigned to respondents' case in April 2024 and that, based on existing reports documenting the progress of the case, she had high hopes for respondents' success at that time. As to the toxicologist, other than asserting that the witness would have been called "to explain disputed positive drug screens and their levels," respondents have not presented, by way of affidavit or otherwise, the actual substance of the witness's proposed testimony, and it is not apparent from the existing record whether the witness would have provided testimony favorable to respondents. Regardless, there was ample testimony presented at the termination hearing from the owner of the testing facility regarding the values on drug screens, testing protocols, and the reliability of various different types of testing, and both of respondents' attorneys thoroughly cross-examined that witness on those subjects.

And as to the proposed documentary evidence, all of it was unnecessarily cumulative. The documents would have been offered to show that respondents treated at a methadone clinic, completed two rounds of inpatient treatment, had adequate housing, and were employed, but significant evidence regarding these points was admitted throughout the proceedings and at the termination hearing, and was not seriously in dispute. Additionally, the record indicates that respondents' attorneys did not introduce several pieces of documentary evidence specifically because they did not want those documents available for use by DHHS at the termination hearing.

Counsel's decisions regarding what evidence to present and what witnesses to call at trial, if any, are generally a matter of trial strategy, *People v Horn*, 279 Mich App 31, 39; 755 NW2d 212 (2008), and on this record, respondents have not overcome the heavy burden of showing that their attorneys' decisions regarding these matters were not the product of objectively reasonable strategy, *Trakhtenberg*, 493 Mich at 52; see also *Ackley*, 497 Mich at 388-389. Accordingly, because respondents have failed to show that their attorneys' performance was deficient, they are not entitled to relief on their claims of ineffective assistance. *Casto*, 344 Mich App at 611-612; *Shaw*, 315 Mich App at 672.

Respondents alternatively ask this Court to remand for a *Ginther*[7] hearing to further develop their claims of ineffective assistance. Respondents, however, have failed to "demonstrate[] any issue for which further factual development would advance [their] claim." *People v Chapo*, 283 Mich App 360, 369; 770 NW2d 68 (2009); see also MCR 7.211(C)(1)(a) (providing, in relevant part, that a motion to remand "must . . . show . . . that development of a

---

[7] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

factual record is required for appellate consideration of the issue" and "must be supported by affidavit or offer of proof regarding the facts to be established at a hearing"). Neither respondent has provided an affidavit from their respective attorney pertaining to their decisions regarding what witnesses to call and what documentary evidence to introduce at the termination hearing, nor have they presented an affidavit from their therapists, their previous caseworker, or the toxicologist describing their expected testimony at the *Ginther* hearing. And, as discussed, the existing record indicates that the decisions of respondents' attorneys were reasonably strategic, and the additional materials that respondents have provided, even if accepted on their face and as appropriate offers of proof, do not indicate otherwise. Respondents have thus failed to show that a *Ginther* hearing is necessary to properly dispose of their ineffective-assistance claims.

## VI. ADJOURNMENTS

Lastly, respondents argue that the trial court abused its discretion by declining, on two separate occasions, their requests to adjourn the termination hearing. Specifically, respondents argue that there was good cause to grant their requests because their attorneys had withdrawn shortly before the termination hearing, and the trial court erred by concluding otherwise. We review a trial court's decision regarding a motion for an adjournment or continuance for an abuse of discretion. *In re Jackson*, 199 Mich App 22, 28; 501 NW2d 182 (1993). A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes or when it makes an error of law. *In re Piland*, 336 Mich App 713, 720; 972 NW2d 269 (2021).

In child-protective proceedings, "[a]djournments of trials or hearings . . . should be granted only (1) for good cause, (2) after taking into consideration the best interests of the child, and (3) for as short a period of time as necessary." MCR 3.923(G); see also MCL 712A.17(1). "[F]or a trial court to find good cause for an adjournment, a legally sufficient or substantial reason must first be shown." *In re Utrera*, 281 Mich App 1, 11; 761 NW2d 253 (2008) (quotation marks and citation omitted). A legally sufficient or substantial reason amounts to "a legal excuse for failing to perform an act required by law." *Id*. at 10-11 (quotation marks and citation omitted).

Respondents in this case do not raise any issue regarding the "best interests of the child" or the "as short a period of time as necessary" requirements of MCR 3.923(G). Rather, they only argue that they satisfied the "good cause" requirement under MCR 3.923(G) when requesting the adjournments because they had obtained new attorneys who needed more time to prepare for the termination hearing. But even if respondents had ostensibly established good cause for an adjournment, the trial court was still required to consider that good cause in light of the children's best interests and to limit any adjournment to "as short a period of time as necessary." MCR 3.923(G). And it is clear from the record that even if "a legally sufficient or substantial reason" for an adjournment existed, *Utrera*, 281 Mich App at 11 (quotation marks and citation omitted), the court did not err by concluding that the requested adjournments were not in the children's best interests because it would unduly delay the proceedings, see *Piland*, 336 Mich App at 720.

At a hearing on August 26, 2024, respondents requested an adjournment of the termination hearing scheduled to take place on September 12 and 13, 2024, arguing that their recently-retained attorneys would have insufficient time to prepare for the termination hearing. The trial court denied the requested adjournment, noting that it had already adjourned the termination hearing— which was initially set to begin on July 2, 2024—twice when, on two separate occasions,

-12-

respondents' attorneys withdrew as counsel due to a breakdown in the attorney-client relationship and that these adjournments had already resulted in the matter far exceeding the timelines set forth in MCR 3.977(H)(1)(b). The court found that the hearing dates gave the parties "a reasonable time to get prepared" because respondents' new attorneys had begun working on the case at least a month prior, and it emphasized that if it were to put off the hearing any longer, the matter would necessarily be assigned to a "new judge," which would only "create[] other problems."

After proceeding with the termination hearing on these dates but before the hearing was set to conclude, both of respondents' attorneys moved to withdraw as counsel due to a complete and total breakdown in the attorney-client relationship, to which DHHS objected because it would disrupt and only further delay the nearly-complete termination hearing. At the start of the best-interests hearing on October 16, 2024, the court denied the attorneys' motions because granting them would necessarily require an adjournment "to give that [new] lawyer[s] time to get up to speed," which would cause an extraordinary delay in the proceedings. The court emphasized that further delaying the proceedings by another one to three months—something that would ultimately result in the case being assigned to a new judge—only "create[d] even more problems" and was "contrary to everyone's best interests," particularly given that the parties were "closer to the end" of the proceedings "than [they were to] the beginning."

We agree with the trial court's findings in this regard. "The hearing on a supplemental petition for termination of parental rights . . . must be held within 42 days after the filing of the supplemental petition," but the court may extend this period by 21 days if good cause to do so is shown. MCR 3.977(H)(1)(b). DHHS filed the supplemental petition on June 6, 2024, so the termination hearing was required to be held by July 16, 2024, or upon a showing of good cause, by August 6, 2024. See *id*. As the trial court duly noted, the case was well past these deadlines due to its two prior adjournments that resulted from each respondent obtaining new counsel, and had the court granted either of the requested adjournments now challenged on appeal, it would have only delayed the proceedings—and resolution for respondents' children—even further. When respondents requested the adjournments, the children had already been in care for more than 16 months, and those adjournments would have kept them in care for at least another one to three months—despite that the court had already received all of the parties' proofs, had already determined there was sufficient evidence in support of the cited statutory grounds for termination, and was only to receive supplemental proofs regarding the children's relative placement so that it could properly weigh that factor when making its best-interests determination. The children were entitled to a final disposition of this case in order to provide them with permanence, finality, and stability. See generally *Simpson*, ___ Mich App at ___; slip op at 5. Any additional adjournment would have only further delayed permanency for the children and would have been contrary to their best interests. Accordingly, the trial court did not abuse its discretion by refusing respondents' requests to adjourn the termination hearing. See *Utrera*, 281 Mich App at 10-11; see also *Piland*, 336 Mich App at 720.

Affirmed.

/s/ Michael F. Gadola
/s/ Philip P. Mariani
/s/ Christopher M. Trebilcock

-13-