*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

FRANK DAVID KEIPP,

        Defendant-Appellant.

UNPUBLISHED
June 22, 2026
8:50 AM

No. 369030
Oakland Circuit Court
LC No. 2021-278951-FC

Before: MARIANI, P.J., and MURRAY and PATEL, JJ.

PER CURIAM.

Defendant appeals by right his bench-trial conviction of second-degree murder, MCL 750.317. He was sentenced, as a fourth-offense habitual offender, MCL 769.12, to 50 to 80 years' imprisonment. On appeal, defendant argues that defense counsel was ineffective for failing to secure an expert witness and use the victim's statement at trial. Defendant also asserts that his sentence is disproportionate and unconstitutional, and he should receive additional jail credit. Finding no errors warranting reversal, we affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

Defendant's conviction arises from the July 24, 2020 death of the victim, who died of a pulmonary thromboembolism after sustaining injuries from a June 30, 2020 assault that defendant claims was a resuscitation attempt (the incident).

Defendant and the victim met in 2015. They developed a romantic relationship and defendant moved into the victim's home. In 2016, defendant was incarcerated but he and the victim continued to communicate with each other. Defendant moved into his own residence after his 2019 release from prison. Although defendant and the victim did not live together, defendant testified that they maintained a friendship.

On the evening of the incident, defendant invited the victim to his residence. They both drank alcohol and smoked crack cocaine. Defendant testified that he found the victim unconscious when he returned from a trip to the bathroom. According to defendant, he attempted to revive the

-1-

victim by smacking her once in the face, shaking her, and pumping her chest. He eventually carried the victim outside of his residence where he continued his resuscitation efforts and called for help.

Several witnesses observed defendant's conduct outside of his residence. Laura Nigro, and her minor child, SS, both testified that it did not appear that defendant was helping the victim. SS stated that defendant dragged the victim out of his residence by her hair, jumped on the victim with his foot, and slapped her repeatedly in the stomach. Nigro testified that defendant struck the victim in the face with his palm at least 50 times and brought his knees onto the victim's side with full force at least ten times. Nigro eventually pushed defendant off the victim and contacted the authorities.

The victim suffered multiple fractured ribs and a fractured sternum as a result of the incident. She spent a week in the intensive care unit (ICU). After being discharged, the victim had limited mobility. She passed away on July 24, 2020.

Defendant was initially charged with misdemeanor domestic violence, MCL 750.81, but that charge was dismissed and he was recharged with aggravated domestic violence, MCL 750.81a(2). The domestic violence charge was eventually dismissed and defendant was later charged with open murder, MCL 750.316.

Dr. Mary Pietrangelo, chief deputy medical examiner for Macomb County, performed the victim's autopsy and concluded that the cause of death was "[p]ulmonary thromboembolism due to right lower extremity deep vein thrombosis [(DVT)]." Dr. Pietrangelo explained that the victim had a DVT—or blood clot—in her leg, which broke off and traveled through her heart and into her lungs, preventing the flow of oxygen. This culmination of events led to the victim's death. Dr. Pietrangelo noted that the victim had multiple recent anterior rib fractures from the paramedics' medical intervention on the date of her death. Additionally, the victim had an older sternum fracture and older rib fractures in the anterolateral, lateral, and posterior regions of the rib cage, which was a different location than the new fractures. Dr. Pietrangelo opined that the older fractures were consistent with the injuries the victim sustained in the June 30, 2020 assault. Dr. Pietrangelo testified that the victim's immobility and trauma from the fractures predisposed her to form clots. Dr. Pietrangelo opined that the manner of death was a homicide on the basis of the "nonnatural" rib and sternum fractures that the victim sustained in the assault. Dr. Pietrangelo stated, "The rib fractures occurred, the immobility occurred, and over time, this process began and propagated until the ultimate outcome was fatal pulmonary thromboembolism." Dr. Pietrangelo acknowledged that the victim had several risk factors that likely contributed to her blood clot, including obesity, diabetes, pancreatic cancer, and cocaine use. However, she maintained that the number of contributory factors did not change the homicide classification because all the factors existed before the assault, and the victim had no history of blood clots. Despite the victim's other conditions, Dr. Pietrangelo maintained that the rib and sternum fractures "tipped the scale" that led to her death.

The trial court convicted defendant of second-degree murder at the end of a three-day bench trial and sentenced him as indicated. Following his conviction and sentence, defendant appealed. While his appeal was pending, defendant moved for a new trial, evidentiary hearing, resentencing, and correction of his invalid sentence, alleging the same errors that he raises on appeal. After a

three-day *Ginther*[1] hearing on defendant's ineffective-assistance-of-counsel claim, the trial court denied defendant's motion for a new trial in a 27-page opinion and order. In a separate opinion and order, the trial court denied defendant's request for resentencing. We now consider defendant's arguments on appeal with the benefit of a comprehensive record.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that trial counsel was ineffective for failing to secure an expert witness and introduce an exculpatory statement by the victim at trial. We disagree.

An ineffective-assistance-of-counsel claim presents a "mixed question of fact and constitutional law." *People v Yeager*, 511 Mich 478, 487; 999 NW2d 490 (2023). We review de novo constitutional questions and the trial court's findings of fact, if any, are reviewed for clear error. *Id.*

The United States and Michigan Constitutions afford criminal defendants the right to effective assistance of counsel. *Id.* at 488, citing Const 1963, art 1, § 20; US Const Am VI; *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984). To prevail on a claim of ineffective assistance, "a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that [the] outcome would have been different." *Yeager*, 511 Mich at 488 (cleaned up). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (cleaned up). "Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise." *People v Head*, 323 Mich App 526, 539; 917 NW2d 752 (2018) (cleaned up).

We will not second-guess matters of trial strategy or "assess counsel's competence with the benefit of hindsight." *People v Abcumby-Blair*, 335 Mich App 210, 237; 966 NW2d 437 (2020) (cleaned up). "Decisions regarding what evidence to present, whether to call witnesses, and how to question witnesses are presumed to be matters of trial strategy[.]" *People v Horn*, 279 Mich App 31, 39; 755 NW2d 212 (2008). Decisions on whether to retain expert witnesses are also matters of trial strategy. *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009). Additionally, "[c]ounsel always retains the duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012) (cleaned up). "A particular strategy does not constitute ineffective assistance of counsel simply because it does not work." *People v Carll*, 322 Mich App 690, 702; 915 NW2d 387 (2018) (cleaned up).

### A. EXPERT WITNESS

Defendant maintains that trial counsel performed deficiently by failing to secure an expert witness for trial because he wasted the majority of his time to find a suitable expert and focused

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

on the issue of causation to the exclusion of making a reasonable investigation into whether expert support existed to challenge the *mens rea* element of the offense. We disagree.

"The elements of second-degree murder are: (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse." *People v Gafken*, 510 Mich 503, 511; 990 NW2d 826 (2022) (cleaned up).[2] There are several methods of establishing the element of malice, including "by showing (1) the intent to kill, (2) the intent to cause great bodily harm, or (3) the intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *Id*. The third method of establishing malice can also "be shown by the intent to create a very high risk of death or great bodily harm with the knowledge that death or great bodily harm is the probable result." *Id*. (cleaned up).

Defendant and his trial counsel formed a trial strategy on the basis of two theories: (1) the victim's death was not caused by an act of defendant, and (2) defendant was performing cardiopulmonary resuscitation (CPR) on the victim. Trial counsel elected to focus on causation because the victim died a month after the incident and had several preexisting medical conditions that could have caused a blood clot. Trial counsel believed that the evidence regarding defendant's assault of the victim was "pretty credible" and thus determined that causation was the stronger defense. Trial counsel chose to retain a forensic pathologist to testify at trial regarding causation rather than an emergency physician because a forensic pathologist could testify about the cause and manner of death and opine on whether testimony was credible on the basis of the physical evidence. Conversely, an emergency physician could only offer testimony regarding the provision of medical treatment and stabilizing patients.

Trial counsel contacted six doctors in his efforts to retain a suitable causation expert. He ultimately decided to retain Dr. Daniel Spitz, a forensic pathologist, and obtained the necessary approval and public funding to retain him. Trial counsel sent Dr. Spitz the relevant discovery on August 29, 2023. However, trial counsel learned that Dr. Spitz had a potential conflict because he worked in the same medical examiner's office where the victim's autopsy was conducted. Hence, trial counsel did not use Dr. Spitz as an expert witness. At the evidentiary hearing, trial counsel conceded that he made a mistake by failing to identify Dr. Spitz's conflict sooner.

With trial approaching on September 26, 2023, trial counsel sought to retain another forensic pathologist. On September 13, 2023, trial counsel sent a letter indicating his interest in retaining Dr. Roshan Mahabir, a forensic pathologist, and included the relevant discovery. Trial counsel indicated in the letter that he was seeking an expert opinion on three issues: (1) cause of blood clots (i.e., diabetes, hypertension, pancreatic cancer, obesity, being sedentary, etc.); (2) whether the bruising on the victim's jaw/neck area was consistent with an attempt to render CPR; and (3) "[a]ny other issues that may be helpful." After Dr. Mahabir reviewed the documents, trial

---

[2] We have recently clarified that " 'without justification or excuse' is not a true element of second-degree murder," and "[i]nstead, it is part of the 'cluster of ideas' about the act of murder that our Legislature adopted in 1846 by enacting the homicide statutes." *People v Spears*, 346 Mich App 494, 522; 13 NW3d 20 (2023).

counsel had two conversations with him. According to trial counsel, Dr. Mahabir stated if he testified at trial he would opine with medical certainty that the victim's injuries sustained in the incident led to the blood clot, which caused her death. Trial counsel maintained that he asked Dr. Mahabir whether the victim's rib fractures were consistent with CPR, and Dr. Mahabir stated that the victim's injuries were so extensive that it was "hard to fathom that it was all based on CPR." However, trial counsel did not recall whether he asked Dr. Mahabir if the victim's injuries were consistent with 50 punches to her face or an adult male jumping on her chest. Trial counsel explained that he did not think expert testimony was necessary to rebut Nigro's testimony because the victim did not have substantial facial bruising or fractures, which would be expected if she were punched 50 times in the face at full force. Ultimately, trial counsel decided not to call Dr. Mahabir as a witness and asked him not to prepare a report because his opinion was damaging to defendant's causation theory. Against defendant's wishes, he went to trial without an expert to support his theories.

The trial court concluded that trial counsel exercised reasonable due diligence and his failure to retain an expert did not fall below an objective standard of reasonableness. We agree. The record reflects that trial counsel reasonably investigated the facts at issue in determining whether to call an expert to testify and made multiple attempts to obtain an expert, including consulting a list and reaching out to other doctors for recommendations of potential experts. He spoke with several doctors before retaining Dr. Spitz, and after his arrangement with Dr. Spitz fell through, he made further efforts to retain Dr. Mahabir. While the timing of trial counsel's efforts to secure an expert may not have been ideal, we will not second-guess matters of trial strategy or "assess counsel's competence with the benefit of hindsight." *Abcumby-Blair*, 335 Mich App at 237 (cleaned up). This case does not present a scenario where "counsel did no consultation at all beyond settling on the very first expert he encountered," and courts have recognized the general proposition "that counsel is not required to shop for experts until finding one who will offer favorable testimony." *People v Ackley*, 497 Mich 381, 392; 870 NW2d 858 (2015).

Contrary to defendant's assertion that trial counsel "failed to ask Dr. Mahabir the right questions," there is evidence that trial counsel asked Dr. Mahabir whether the victim's injuries were consistent with a CPR attempt. Trial counsel's letter posed two specific questions that targeted each of defendant's theories and a third question with the goal of discovering any additional medical issues that would have been useful to the defense. After Dr. Mahabir reviewed the relevant documents, trial counsel had two conversations with him. Trial counsel and Dr. Mahabir both testified that they discussed CPR in some context. While Dr. Mahabir testified at the *Ginther* hearing that "[t]here is no reason to think that this was not CPR," he later clarified that he could not state with medical certainty whether the victim's old, healing rib fractures were caused by a person performing CPR improperly. Dr. Mahabir further opined that the victim's injuries were consistent with the eyewitnesses' accounts of the incident. Dr. Mahabir testified that his opinion would not have been helpful to the defense because he agreed with Dr. Pietrangelo's conclusion that the victim's rib injuries ultimately caused her death. As to the third question in trial counsel's letter, Dr. Mahabir explained that he interpreted that question to inquire whether there were any other findings in the autopsy report or records that could have contributed to the cause of death. Dr. Mahabir testified that there was not a broad disagreement in the medical community regarding the issues in the case, that he was qualified to render an opinion regarding the victim's cause of death, and he never told trial counsel that he should consult a different expert

instead. Trial counsel's efforts satisfied his "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 US at 691.

Defendant faults trial counsel's focus on causation to the exclusion of *mens rea*, stating that his trial "should have been about one question," and that *mens rea* was "the only element truly at issue." But defendant testified at the evidentiary hearing that he wanted to contest causation in addition to establishing that he was performing CPR. Based on this mutually agreed-upon strategy, it was reasonable for trial counsel to focus on refuting causation, especially because trial counsel opined that the evidence establishing that defendant assaulted the victim was "pretty credible," the victim had several preexisting medical conditions, and her death occurred one month after the assault.

Trial counsel clearly did not abandon the *mens rea* element at trial. He elicited testimony from Dr. Pietrangelo that rib fractures commonly result from CPR. During closing arguments, trial counsel argued that defendant's account of trying to revive the victim was consistent with the evidence. He further asserted that SS's and Nigro's testimony that defendant was assaulting the victim was a misperception of defendant's behavior that was unsupported by the medical evidence. Specifically, trial counsel argued that Nigro's testimony that defendant forcefully punched the victim in the face 50 times was inconsistent with the victim's facial injuries. Trial counsel maintained that the evidence supported that defendant was trying to revive the victim and he did not have the requisite state of mind for second-degree murder because he did not intend to kill the victim, do great bodily harm, or knowingly create a risk of great bodily harm. Trial counsel argued that at best, defendant's "manner of provid[ing] life-saving measures w[as] grossly negligent, thus reducing it to a lesser crime and mandating a not guilty verdict as it relates to second-degree murder." However, the trial court ultimately found Nigro and SS credible and defendant's version of events lacked credibility and thus concluded that the *mens rea* element was satisfied.

Defendant fails to overcome the strong presumption that trial counsel's decision-making was the result of a sound trial strategy. See *Head*, 323 Mich App at 539. "A particular strategy does not constitute ineffective assistance of counsel simply because it does not work." *Carll*, 322 Mich App at 702 (cleaned up). This case is distinguishable from *Ackley*, where the defendant's counsel did nothing to investigate the availability of a suitable expert and neglected to research the critical issues to enable putting forth a defense. The defendant's counsel's ineptitude in *Ackley* deprived the defendant of a defense. De novo review of the record establishes that such deficiencies are not present in this case. The record reflects that trial counsel acted prudently under the circumstances, developed a sound trial strategy, and presented a strong defense for defendant. Accordingly, his conduct did not fall below an objective standard of reasonableness. Because defendant has not demonstrated that trial counsel performed deficiently, it is not necessary for us to determine whether there is a reasonable probability that the outcome of the trial would have been different if he had secured a medical expert to testify at trial. See *Strickland*, 466 US at 697.

## B. VICTIM STATEMENT

Defendant also argues that trial counsel was ineffective for failing to introduce an exculpatory statement by the victim at trial, which would have negated the *mens rea* element of the offense. We disagree.

-6-

The victim's handwritten statement to the police on the day of the incident reads as follows:

> Was visiting with [defendant] beginning at 6 p.m. drinking Mike's [H]ard [L]emonade[.] Air conditioner not working—discussing how hot the weather is[.] [Defendant] stating he was going to purchase a new window air conditioner soon. We were just talking he embraced me he was wiping my face with a cool cloth and he just snapped[.] I really don[']t know why he started slapping and hitting me but not hard enough to hurt me. He could have really hurt me if he wanted to. But he showed restraint he dragged me out of the trailer and was yelling and sitting on me making it hard for me to breathe. The neighbors saw what was happening and demanded he get off of me[.] He stated I was trying to kill myself (not true)[.] Neighbors called police ordered him to go inside trailer. He complied. He did not hurt me.

Defendant asserts that trial counsel should have sought to admit the statement at trial because portions of it demonstrate that he was not acting with malice during the incident. In particular, defendant emphasizes the victim's account that he "started slapping and hitting [her] but not hard enough to hurt [her]," and "could have really hurt [her] if he wanted to," but "he showed restraint," and "did not hurt [her]."

At the evidentiary hearing, trial counsel testified that he was aware of the victim's statement but did not seek to introduce it as evidence because it was hearsay, it included other inculpatory information, and it could have opened the door for damaging statements by the victim's daughter to come in as prior inconsistent statements. Trial counsel also explained that the evidentiary value of the statement would be undermined by other evidence that clearly established that defendant hurt the victim.

The trial court concluded that trial counsel's decision not to seek admission of the victim's statement did not fall below an objective standard of reasonableness because the statement "ultimately supported the prosecution's theory that the defendant assaulted her" and "the medical evidence corroborated a very serious assault . . . ." We agree. Even assuming that the victim's statement was admissible,[3] trial counsel reasonably determined that its admission would be more prejudicial than probative. As he noted, the statement includes other inculpatory information that would have damaged the defense, including that defendant "just snapped," and started hitting the victim, dragged her out of the trailer, and sat on the victim. These statements tend to support the prosecution's theory that defendant was assaulting the victim, not performing CPR. By not admitting the statement, trial counsel left defendant's account of the events inside the trailer unrebutted. Had trial counsel admitted the statement, there would have been evidence that the victim did not pass out or become unresponsive before defendant struck her, which would have

---

[3] Defendant conceded in his supplemental briefing in the trial court that the statement is hearsay, and contended that "it would be admissible under MRE 803(24) given the importance of the statement, and given that various other contradictory hearsay statements also came in." The trial court did not address whether the statement was admissible and defendant advances no argument regarding the statement's admissibility on appeal.

been significantly detrimental to the CPR defense. Admission of the statement also could have opened the door to more damaging testimony from the victim's daughter indicating that defendant "significantly hurt her."

Defendant fails to overcome the strong presumption that trial counsel's decision not to seek admission of the victim's statement was the result of a sound trial strategy. See *Head*, 323 Mich App at 539. Because defendant has not demonstrated that trial counsel performed deficiently, it is not necessary for us to determine whether there is a reasonable probability that the outcome of the trial would have been different if he had sought to admit the victim's statement. See *Strickland*, 466 US at 697.

## III. SENTENCING

Defendant next argues that his sentence violates the principle of proportionality, as well as the prohibition against cruel and/or unusual punishment under the United States and Michigan Constitutions. We disagree.

### A. STANDARDS OF REVIEW

"Sentencing decisions are reviewed for an abuse of discretion." *People v Boykin*, 510 Mich 171, 182; 987 NW2d 58 (2022). "An abuse-of-discretion standard recognizes that there may be more than one principled outcome and the trial court may not deviate from that principled range of outcomes." *Id*., citing *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003). "Whether a defendant's sentence constitutes cruel and/or unusual punishment under the Eighth Amendment of the United States Constitution or Article 1, § 16 of the Michigan Constitution are questions of constitutional law that we review de novo." *People v Stovall*, 510 Mich 301, 312; 987 NW2d 85 (2022).

### B. PROPORTIONALITY

"[W]ithin-guidelines sentences are to be reviewed for reasonableness" on appeal. *People v Posey*, 512 Mich 317, 359; 1 NW3d 101 (2023) (Opinion by BOLDEN, J.).[4] "[T]he key to reasonableness review is whether the sentence is proportionate." *Id.* A trial court abuses its discretion if the sentence imposed is not "proportionate to the seriousness of the circumstances surrounding the offense and the offender." *People v Steanhouse*, 500 Mich 453, 459-460; 902 NW2d 327 (2017) (cleaned up). A proportionate sentence considers "the reformation of the offender, the protection of society, the discipline of the offender, and the deterrence of others from committing the same offense." *Boykin*, 510 Mich at 183. But "these are not the only relevant sentencing criteria and trial courts are not required to consider each of these factors when imposing a sentence." *Id*. at 183-184.

---

[4] While *Posey* was a plurality opinion that is not technically binding, this Court concluded that following the essential holdings upon which the *Posey* majority agreed was prudent "in the interest of judicial economy and jurisprudential stability." *People v Purdle (On Remand)*, 350 Mich App 446, 453-454; 32 NW3d 479 (2024).

"When a trial court sentences a defendant within the guidelines' recommended range, it creates a presumption that the sentence is proportionate." *Posey*, 512 Mich at 360. To overcome that presumption, "the defendant bears the burden of demonstrating that their within-guidelines sentence is unreasonable or disproportionate." *Id.* at 359. A defendant may overcome the presumptive proportionality of a within-guidelines sentence by "present[ing] unusual circumstances that would render the presumptively proportionate sentence disproportionate." *People v Bowling*, 299 Mich App 552, 558; 830 NW2d 800 (2013) (cleaned up); see also *Milbourn*, 435 Mich at 636 ("Conceivably, even a sentence within the sentencing guidelines could be an abuse of discretion in unusual circumstances."). "Unusual" means "uncommon, not usual, rare." *People v Sharp*, 192 Mich App 501, 505; 481 NW2d 773 (1992) (cleaned up).

In this case, it is undisputed that the applicable guidelines range was 30.4 to 100 years or life imprisonment, and the trial court sentenced defendant to a minimum term of 50 years, which is within the guidelines range. Therefore, defendant's sentence is presumptively proportionate. *Posey*, 512 Mich at 360. Defendant argues that his sentence is not proportional to his offender status because upon his release from prison in 2019, he demonstrated potential for rehabilitation by finding work and buying a home. Additionally, he claims that his sentence is not proportionate to his offense because he did not have the intent to kill the victim.

The factors that defendant cites to argue that his sentence was disproportionate, such as his employment and lack of culpability, do not qualify as unusual circumstances that would overcome the presumption of proportionality. See *People v Daniel*, 207 Mich App 47, 54; 523 NW2d 830 (1994) ("Moreover, the factors cited by defendant, i.e. his employment, lack of criminal history, and minimum culpability, are not unusual circumstances that would overcome that presumption.").

The trial court noted several factors relevant to defendant's offender status during sentencing. For example, defendant was 60 years old at the time of sentencing and had a lengthy criminal history including 21 felonies and eight misdemeanors. Additionally, defendant was on parole when he committed the offense. While true that defendant got a job and bought a house upon his release from prison in 2019, as the trial court noted in its order denying defendant's motion for resentencing, "when the defendant was given an opportunity to reintegrate into the community, he committed serious new criminal activity—Second-Degree Murder." Defendant's assertion that he "turned away" from his criminal history is unsupported by the record, and the trial court appropriately considered the circumstances of defendant's offender status during sentencing.

The trial court also considered the seriousness of the circumstances regarding defendant's offense. It noted the severity of defendant's conduct by repeatedly smacking the victim and jumping on her with his knees, which resulted in the victim suffering multiple fractures, being admitted to the ICU, and becoming bedridden. Even if defendant did not intend to kill the victim, the evidence established that he had the requisite intent to be convicted of second-degree murder.

Defendant has not demonstrated that his within-guidelines sentence was unreasonable or disproportionate under the circumstances in this case. See *Posey*, 512 Mich at 357. Moreover, although

the goal of punishment could arguably be satisfied by a shorter period of incarceration, this does not render the trial court's sentences unreasonable. The trial court was not required to sentence defendant to the lowest conceivable term that may satisfy the punishment goal for sentencing, particularly in light of all the other considerable factors in this case. [*People v Klungle*, ___ Mich App ___, ___; ___ NW3d ____ (2024) (Docket Nos. 364125 and 367795); slip op at 6.]

The trial court did not abuse its discretion and defendant is not entitled to resentencing.

## C. CRUEL OR UNUSUAL PUNISHMENT

Defendant also argues that his sentence is a de facto life without parole sentence, which violates the prohibition against cruel and/or unusual punishment contained in the United States and Michigan Constitutions. He contends that his sentence is unduly severe, makes him ineligible for parole, and forecloses any possibility of rehabilitation. We disagree.

"The Michigan Constitution prohibits cruel *or* unusual punishment, Const 1963, art 1, § 16, whereas the United States Constitution prohibits cruel *and* unusual punishment, US Const, Am VIII." *People v Burkett*, 337 Mich App 631, 636; 976 NW2d 864 (2021) (cleaned up). "If a punishment passes muster under the state constitution, then it necessarily passes muster under the federal constitution." *Id*. (cleaned up). As an initial note, "a sentence that is proportionate is not cruel or unusual punishment." *People v Powell*, 278 Mich App 318, 323; 750 NW2d 607 (2008) (citation omitted). As we concluded above, defendant's sentence did not violate the principle of proportionality, therefore it is not unconstitutionally cruel or unusual.

Additionally, defendant's argument that he satisfies the factors for establishing cruel or unusual punishment is meritless. Whether a penalty constitutes cruel or unusual punishment is determined by a three-pronged test, which evaluates: "(1) the severity of the sentence imposed and the gravity of the offense, (2) a comparison of the penalty to penalties for other crimes under Michigan law, and (3) a comparison between Michigan's penalty and penalties imposed for the same offense in other states." *Burkett*, 337 Mich App at 636-637 (cleaned up). Defendant maintains that his sentence is cruel or unusual in its severity and in comparison to other sentences in Michigan, emphasizing the fact that his sentence operates as a de facto life sentence that forecloses the possibility of parole given defendant's age. However, this Court has rejected challenges to the constitutionality of a sentence on the basis of a defendant's advanced age because defendants are not entitled to parole under Michigan law. *People v Bowling*, 299 Mich App 552, 558; 830 NW2d 800 (2013). As for penalties imposed in other states, defendant merely asserts that "[j]ust because [de facto life] sentences are imposed do[es] not make them constitutional." However, he otherwise fails to offer "argument or evidence that, in relation to . . . other states, his sentence[] w[as] somehow abnormally harsh." *Id*. at 559. And as discussed above, defendant's other arguments concerning the constitutionality of his sentence are unavailing.

Because defendant cannot establish that his sentence is cruel or unusual, especially in light of its proportionality, his term of imprisonment for 50 to 80 years does not violate the United States or Michigan Constitutions.

## IV. JAIL CREDIT

Finally, defendant argues that *People v Idziak*, 484 Mich 549; 773 NW2d 616 (2009), was wrongly decided and that he should receive jail credit under MCL 769.11b for the 1,222 days he served in jail before sentencing. We disagree.

"Whether a defendant is entitled to credit for time served in jail before sentencing is a question of law that we review de novo." *People v Armisted*, 295 Mich App 32, 49; 811 NW2d 47 (2011). Additionally, "[u]nderlying questions of statutory interpretation are reviewed de novo." *People v Allen*, 507 Mich 597, 604; 968 NW2d 532 (2021).

The jail-credit statute, MCL 769.11b, provides:

> Whenever any person is hereafter convicted of any crime within this state and has served any time in jail prior to sentencing because of being denied or unable to furnish bond for the offense of which he is convicted, the trial court in imposing sentence shall specifically grant credit against the sentence for such time served in jail prior to sentencing.

In *Idziak*, our Supreme Court held,

> [T]he jail credit statute does not apply to a parolee who is convicted and sentenced to a new term of imprisonment for a felony committed while on parole because, once arrested in connection with the new felony, the parolee continues to serve out any unexpired portion of his earlier sentence unless and until discharged by the Parole Board. [*Idziak*, 484 Mich at 562.]

We have subsequently applied this principle, noting that "[w]hen a person on parole commits a subsequent felony and is detained, the time of detention continues to accrue toward the fulfillment of the originally imposed sentence on which parole was granted." *Armisted*, 295 Mich App at 50. In short, the jail-credit statute does not apply where "[t]he parolee is required to remain in jail pending the resolution of the new criminal charge for reasons independent of his or her eligibility for or ability to furnish bond for the new offense[.]" *Id.*

As noted above, defendant was on parole at the time he committed second-degree murder. Accordingly, the jail-credit statute does not apply because upon his detention, defendant continued to serve the unexpired portion of his earlier sentence. *Idziak*, 484 Mich at 562. Because *Idziak* has not been overruled or superseded, we are bound to follow it. See *Associated Builders & Contractors v Lansing*, 499 Mich 177, 191-192; 880 NW2d 765 (2016) (explaining that this Court "is bound to follow decisions by [our Supreme] Court except where those decisions have clearly been overruled or superseded and is not authorized to anticipatorily ignore our [Supreme Court's] decisions where [this Court] determines that the foundations of a Supreme Court decision have

been undermined") (emphasis omitted).[5]  Accordingly, defendant is not entitled to additional jail credit.

Affirmed.

/s/ Philip P. Mariani
/s/ Christopher M. Murray
/s/ Sima G. Patel

---

[5] Defendant concedes that this Court is bound by *Idziak* but raises the issue "so as to preserve it for appellate review and consideration by the Michigan Supreme Court . . . ."